[No. 11147.   Department Two.   August 17, 1914.]

MEL G. DUNCAN *et al., Appellants,* v. PERCY F. PARKER
              *et al., Respondents.*[1]

BROKERS—CONTRACT FOR COMMISSIONS — PERFORMANCE — SALE BY
OWNER.   Where brokers authorized to sell property were not per-
mitted to complete negotiations pending between them and a pros-
pective customer, being told to temporarily cease their efforts to
close a sale, but the owners took up negotiations and, without con-
sulting the brokers, entered into an option contract of sale, the
owners are estopped from asserting that the brokers failed to fur-
nish a customer able and willing to take the property on the terms
under which they were authorized to sell; the general rule that the
securing of an optional contract of sale by a broker employed to
effect an actual sale does not entitle him to recover a commission in
advance of a sale, not applying in such case.

SAME—ACTION FOR COMMISSIONS—DEFENSES—CONTRACT OF OWNER.
In an action by brokers to recover commissions claimed to be due
for the sale of certain real and personal property, upon the owners'
obtaining an option contract of sale, the brokers not being permitted
to complete negotiations pending between them and the customer,
the owners cannot plead the terms of the contract as a defense to
the right of the brokers to recover; since they could not make a con-
tract with the brokers' customer defeating their right to commissions
until after the brokers had concluded their negotiations.

PLEADING — DEPARTURE — REPLY.   In an action for brokers' com-
missions, the reply does not constitute a departure, where the ac-
tion was founded upon an original contract, the complaint alleging
a purchase price of $150,000 on which the plaintiffs claimed commis-
sions, and, the defendants having answered setting up a subse-
quent contract as a substitute for the original, with facts tending
to show nonperformance, the reply, while admitting the subsequent
contract, alleged that it was only partially set out in the answer
and that it was supplemental and in addition to the original con-
tract authorizing the plaintiffs to recover $5,000 additional; since
the reply was not an abandonment of the original cause stated in
the complaint or an attempt to recover upon an inconsistent cause
of action, even if plaintiffs misconceived the effect of the supple-
mental contract; the pleadings as a whole presenting the entire issue
and warranting recovery to the extent of the proof, regardless of
the amount claimed.

[1]Reported in 142 Pac. 657.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered September 25, 1912, dismissing an action on contract, upon granting a nonsuit. Reversed.

*Zent, Powell & Redfield* and *Lovell & Davis,* for appellants.
*J. S. Workman* and *George D. Lantz,* for respondents.

FULLERTON, J.—This is an appeal from a judgment of nonsuit, entered in an action brought by the appellants against the respondents to recover commissions claimed to be due for the sale of certain real and personal property. In April, 1911, the respondents owned a tract of land, situated in Benton county, on the line of the North Coast Railway Company, which they had caused to be platted into a townsite, under the name of Benton City. The record title to this property stood in the name of the respondent Percy F. Parker. At the same time, the respondents Pitman and Woods severally owned desert land claims situated near the townsite. The respondents had also organized a corporation for supplying the town of Benton City and the immediate surrounding country with water for domestic and irrigating purposes, the capital stock of such corporation being owned by the respondents. On April 14, 1911, the respondents, acting through Parker, the holder of the record title, entered into a contract with the appellants Mel G. Duncan and Oliver Dean, and the respondent Elza Dean, as real estate brokers, by the terms of which the brokers undertook to sell for the respondents the townsite property at scheduled prices, for a commission based on the purchase price of each lot or parcel of land sold.

The brokers entered upon the performance of the contract and expended considerable sums of money in advertising the property and exhibiting it to prospective purchasers, but were unable to dispose of it sufficiently fast to satisfy either themselves or the owners. The expense incident to carrying the property had become quite a burden upon the owners, and they became extremely anxious to dispose of it to some person

able financially to relieve them of further expenditures. In the early part of July, 1911, the respondent Pitman, as the representative of the owners, called upon the brokers and discussed with them the possibility of disposing of the entire property in bulk; that is, the desert land claims and the stock in the water company, as well as the townsite property. Several persons were mentioned in this conversation as persons who might be induced to take over the property, among whom was one P. Mullins and one S. J. Harrison; and a tentative agreement was entered into by which the brokers undertook to dispose of the property in bulk for a commission of $5,000 in case of a satisfactory sale. The terms of this contract were afterwards confirmed by letter from Pitman to Duncan, each representing his respective associates, which letter we quote in full:

"July 8th, 1911.

"Mr. Mel G. Duncan,

"305 So. 2d St., San Marco Apts., North Yakima, Wash.

"Dear Sir: I am enclosing herewith a letter for the purpose of special arrangement made with you at the time of my call at your office, a few days ago. This will, I think, serve your purpose nicely, as I have endeavored to cover the entire Benton City undertaking, including the 320 acres of orchard lands, very fully.

"You are authorized to undertake a sale of the entire property on the terms set out in the letter above referred to, with Mr. P. Mullins and his friends, and also with Mr. Harrison and associates. I would not like for you to go outside of these parties without first conferring with us in relation to the matter. My idea is to restrict your canvass to parties who are able financially, and who would be satisfactory purchasers in case you can accomplish a deal.

"You are to understand that you will not be rigidly bound by the figures set out in the letter. If you can interest either combination of gentlemen named upon lower figures (provided, of course, they are not too low), we will entertain a proposition upon any terms which will provide sufficient cash payment to reasonably guarantee the sale.

"I believe you can afford to give special and personal attention—all, of course, in a confidential way—to the working

up of a sale with both of these parties, simultaneously. It
seems to me that a trip to the Sound, for the purpose of seeing
Mr. Harrison, should be immediately in order, and that your
negotiations with each combination should be framed as far as
possible upon the assumption that the present owners are go-
ing to make an immediate turn of the property; and if your
prospective purchasers desire to interest themselves at all,
they should do so without delay.

"In case you make a sale, either at the figures named or any
lesser price acceptable to us, we will pay you a flat commission
of $5,000, the commission to be payable one-half from the first
payment if the same is less than one-third of the considera-
tion, and the remainder *pro rata* from the payment of the suc-
ceeding 25 per cent of the consideration paid upon the prop-
erty. In case there should be more than one-third of the con-
sideration paid in cash, the total commission of $5,000 will be
deducted from the cash payment.

"I am sending, under separate cover, some photographs and
other data which will assist you in making a clear presenta-
tion of the property, and suggest that you add thereto such
maps, advertising matter, etc., from your own collection as
will complete the same in the most attractive manner.

"Very truly yours,
"F. L. Pitman."

The enclosure not specifically mentioned in the letter was
a general letter descriptive of the property, setting forth its
situation, its advantages as a townsite, and the terms on
which it could be purchased. The brokers immediately took
up the question of the sale of the property with the parties
named, making two trips to the Sound to interview Harrison.
While the negotiations with Harrison were in progress, he
was seen by Pitman and the matter of the purchase talked over
between them. After one of these interviews, Pitman wrote
Elza Dean an undated letter, but postmarked August 2, 1911,
in which he used the following language:

"Sorry I failed to meet you. Don't say anything to Mr.
Harrison regarding Benton. Also tell Mel to pass him up
for the present. This I think important."

After the receipt of this letter, the brokers ceased their efforts to close a sale with Harrison, and the negotiations thereafter with him were conducted entirely by the owners. These negotiations resulted in a contract of sale to Harrison, bearing date of October 2, 1911, the material parts of which are as follows:

"This agreement . . . witnesseth, that for and in consideration of the sum of Seventy-two Thousand, Five Hundred and One ($72,501) Dollars, receipt of one dollar of which is hereby acknowledged, the remainder to be paid as hereinafter set out, the parties of the second part hereby sell to the parties of the first part, all of the unsold lots, blocks and parcels of land of said townsite as hereinafter enumerated, upon list marked 'Exhibit A' hereto attached and made a part hereof together with all of the stocks of the Benton City Company, . . . and all of the right, title and interest of the said Charles E. Woods and Sadie I. Woods, his wife, and F. L. Pitman and M. E. Pitman, his wife, in and to said desert claims above described, together with the reservoir, pipe lines, ditches and improvements thereon, and the parties of the first part agree to purchase the same under the conditions herein and at the price above stated.

"It is agreed that the title of said property shall be transferred on or before October 15th, 1911, free and clear of all encumbrances to the Spokane & Eastern Trust Company, or such person in their employ as shall be designated by said Trust Company as Trustee, to be held in trust for the benefit of the said parties of the first part, and with full power and authority in said trustees to act for parties of the second part in all matters pertaining to said trust, and the carrying out of the terms, intent, and purposes of this contract, and to hold said title until the consideration hereunder shall have been paid in full, together with interest thereon. . . .

"It is further agreed that the parties of the first part shall have the right to sell any portion or all of said property at a minimum of one-half the list price of the property within the townsite of Benton City, as the same is shown upon the price list hereto attached and made a part of this agreement, and that they shall also have the right to assign or sell any portion or all of the said desert claims at the minimum price of One Hundred Fifty ($150) Dollars per acre, and that as said

sales shall be negotiated by them, or under their authority, the said Spokane & Eastern Trust Company will join with them in the issuing of contracts or deeds in accordance. herewith, and in form satisfactory to parties hereto.

"It is further agreed that the total sum of $72,500, hereinbefore set out as the sum remaining unpaid upon said property, shall be due and payable on the 30th day of October, 1921, together with all unpaid interest thereon, from and after the first day of October, 1914, all past due interest shall be considered principal and shall draw interest after maturity. Said payment and the interest as specified shall be reduced by any payment or payments which shall have been made from sales of property to said date of October 30, 1921, in accordance with the conditions herein for the making of sales.

"As a part consideration hereunder the parties agree to improve the lands covered by this contract and every part thereof, excepting . . . on or before the 30th day of August, 1914, and to improve at least one-third of said property each year, beginning with October 15th, 1911, said improvements shall consist of the grading of said land and the growing thereon of agricultural or horticultural crops by irrigation in a first-class and husbandlike manner.

"It is further agreed that a portion of said property, amounting to the aggregate of $30,000 at retail price selected by said first parties, shall be reserved and used by them in the improvement of said land and property, and that contracts to third parties will be executed by said trustee upon request of said first parties, covering said lands thus reserved or any part thereof, in payment for work and materials utilized in said improvement. The selection of said lands by first parties may be made at any time from the unsold areas of said property. No accounting for the use of said lands shall be demanded from first parties by second parties, excepting a showing that the full value of said land has been received by the first party in either labor and materials and used for the improvement of said land as herein set out.

"It is further agreed that said first parties will at all times diligently urge the sale of said lands in accordance herewith, and that eighty (80%) per cent of all proceeds of and collections thereon shall be paid over to said trustee for the benefit of said second parties until the full sum of $72,500

and the interest thereon has been paid, provided said first parties shall be permitted to retain not exceeding one-half of all payments upon each and every sale of said lands until the actual cost of selling in commissions paid by them to third parties shall have been covered; it being understood that no commission under this paragraph shall exceed 20% of the amount of the sale. Said parties agree to make a statement to the said trustee upon the first day of each and every month after the date hereof showing the sales and collections made during the preceding month and to remit with said statement the amount due in accordance with this paragraph.

"It is further understood by and between the parties hereto that all of the personal property owned by said parties and used in the development of said land and now located upon the land, are included in this transfer to said third parties. The same consists of hay on hill and at barn; two horses, one wagon, one buggy, set harness, halters, robes, etc.; office furniture, plows, shovels, picks, etc.; hose and hose wagon, wood-stave pipe and pipe fixtures, worth in total the sum of $905, and that in case said first parties shall make default in the terms of this contract, and second parties are thereby compelled to foreclose or annul the same, that in that case the said parties of the first part agree to refund in cash to said second parties for said personal property in this paragraph mentioned the sum of $905, and that in case said first parties fail to make said payments, that the same may be collected by process of law as a true and just obligation.

"Time is of the essence of this agreement, and it is understood by and between the parties hereto that failure on the part of the parties of the first part to comply with any of the terms and conditions hereinbefore set out on their part to be performed shall work a forfeiture of this contract, and improvements made on said lands shall be accepted as liquidated damages, without any further claim against said parties of the first part, or the same may be foreclosed as a real estate mortgage."

After the execution of the contract, the brokers presented to the owners a claim for commissions, which claim the owners refused to recognize. This action was thereupon begun to recover the same, resulting in a judgment of nonsuit, as before stated. The trial judge rested his conclusion on two

grounds; first, that the contract entered into between the owners and Harrison was an option to purchase merely, not an enforcible contract of sale, and applied the general rule that a broker, empowered to sell real estate upon stated terms, cannot recover a commission when he produces a purchaser willing only to enter into an optional contract to take the property; and, second, that conceding the contract to be a sale, the brokers could only recover commissions on the basis of the sums paid on the contract, and that here the proofs failed to show that any sum had as yet been paid to the owners upon the contract.

It is undoubtedly the general rule that the procurement by a broker of a mere optional contract of sale does not entitle him to recover a commission in advance of a sale, when his undertaking is to effect an actual sale. This is held by courts generally, and has been repeatedly held by this court. *Dwyer v. Raborn*, 6 Wash. 213, 33 Pac. 350; *Jones & Co. v. Eilenfeldt*, 28 Wash. 687, 69 Pac. 368; *Lawrence v. Pederson*, 34 Wash. 1, 74 Pac. 1011; *Neely v. Lewis*, 38 Wash. 20, 80 Pac. 175. But the rule, we think, is without application to a case presenting facts such as are presented in the case at bar. Here the brokers were not permitted to complete the negotiations pending between themselves and their customer. The owners took the burden of the negotiations upon themselves, and, without consulting the brokers, entered into a contract of sale of the property with the customer, thereby not only preventing a sale by the brokers to the particular customer, but preventing a sale to the other customer with whom they were authorized to deal. The owners are thus estopped from asserting that the brokers did not furnish a customer ready, able, and willing to take the property on the terms under which they were authorized to make a sale.

Nor can the owners plead the terms of the contract as a defense of the right of the brokers to recover. The contract entered into for the sale of the property was not the brokers' contract. It was the contract of the owners, with the terms

of which the brokers had nothing to do. It may or may not have been the best or only contract the purchaser would enter into. This issue has been placed by the conduct of the owners beyond the possibility of proof; for, conceding that an optional contract is the best and only contract that the owners could make with the purchaser, it by no means follows that the brokers could not have made an actual sale to him on the terms under which they held the property for sale, or on terms satisfactory to the owners. This could only be determined by allowing the brokers to proceed with the negotiations, which privilege the owners, for their own purposes, took away from them. To allow them now to plead the contract as a defense to the right of the brokers to recover, would be to allow one to plead his own independent conduct as a defense to the lawful claims of another. The owners could not make a contract with the brokers' customer so as to defeat their claim for commissions until after the brokers themselves had concluded their negotiations with him. The language of the court in *Lawson v. Black Diamond Coal Min. Co.*, 53 Wash. 614, 102 Pac. 759 (quoting from *Chilton v. Butler*, 1 E. D. Smith (N. Y.) 150), is applicable here:

"If vendors were permitted to employ brokers to look up purchasers, and call the attention of buyers to the property which they desired to sell, limiting them as to terms of sale, and then, while such purchasers were negotiating, take the matter into their own hands, avail themselves of the labor, services and expenses of the broker in bringing the property into market, and accomplish a sale by an abatement in the price, and yet refuse to pay the broker anything, the business of a broker would not be worth pursuing; gross injustice would be done; every unfair and illiberal vendor would limit his property at a price slightly above the market, and make use of the broker to bring it into notice, and then make his own terms with the buyers, who were in reality procured by the efforts of the agent."

See, also, *Peterson v. St. Francis Hotel Co.*, 61 Wash. 378, 112 Pac. 347. Our conclusion is, therefore, that the court erred in granting a nonsuit for either of the reasons stated.

Since the cause must go back for a new trial, it is necessary that we notice certain other questions suggested at the argument. The appellants founded their cause of action upon the original contract, and alleged that the purchase price was $150,000 on which they were entitled to a commission of $37,500. The actual terms of the contract with Harrison, and the subsequent contract evidenced by the letter, appeared in the answer. The answer also set forth facts tending to show that the appellants were not entitled to recover on the subsequent contract. The reply admitted a subsequent contract as alleged, but averred that it was only partially set forth in the letter of Pitman; that the additional contract was supplemental to and in addition to the original contract, authorizing the brokers to receive the sum of five thousand dollars in addition to the amounts receivable for making a sale under the original contract, but not a substitute therefor. Other facts alleged tending to show want of a right to recover were put in issue by denials. It is contended that there is here a departure in pleadings on the part of the appellants, under the rule of *Distler v. Dabney*, 3 Wash. 200, 28 Pac. 335, and that they must recover upon the original contract, if they recover at all. But we think the contention not well founded. Plainly, the appellants did not in their reply abandon their original cause of action, and attempt to recover upon another and inconsistent cause of action set forth in the reply, as was the fact in the case cited. The appellants are still maintaining that they are entitled to recover on their original cause of action. It may be that they incorrectly conceive the effect of the subsequent contract; indeed, we may say that we think they have incorrectly conceived it and that the limit of their recovery is $5,000, but the pleadings as a whole present the entire issue, and as this is the sole and only purpose of pleadings, either party may recover to the extent the proofs warrant. Neither should be denied a recovery to this extent even though they may have claimed more.

The judgment is reversed, and the cause remanded for a new trial.

CROW, C. J., PARKER, MOUNT, and MORRIS, JJ., concur.