[No. 38528.     Department One.     December 29, 1966.]

EUGENE D. ZELENSKY, *Respondent*, v. THE VIKING EQUIP-MENT CO., INC., *Appellant*, SIMONSEN RADIO A/S, *Respondent.**

*Reported in 422 P.2d 293.

*Newman H. Clark* (of *Matsen, Clark, Cory & Matsen*), for appellant.

*Pomeroy, Zelensky, Furnia & Munro,* for respondents.

SOULE, J.†—This proceeding started as a simple action by Eugene Zelensky, the assignee of a Norwegian manufacturer, to collect an account from a local distributor. It developed into a sharp controversy arising from a counterclaim by the distributor.

Simonsen Radio A/S is a Norwegian corporation which manufactures echo-sounding and sonar equipment suitable for use on fishing vessels. It also manufactures a very advanced line of experimental electronic equipment for research purposes. For the purposes of this action, plaintiff Zelensky's interests are identical with Simonsen Radio A/S, and in the opinion hereafter we will refer only to Simonsen Radio A/S, the true party in interest, and for brevity will refer to it as Simonsen.

The Viking Equipment Company is a Washington corporation which distributes machinery. In 1959 it entered into a written contract with Simonsen whereby it became the exclusive distributor for Simonsen in Washington, Oregon, and California. On October 9, 1960, a new contract was executed similar in terms, but enlarging Viking's territory to include Alaska and Hawaii. That contract provided, in part, as follows:

> I. DISTRIBUTORSHIP. The Company grants to the Distributor the exclusive right to sell the marine line of the Company's products, including its Radio-telephones, Echo Sounders, Asdic Sounders and Supplementary gear and White Line Recorders directly and through qualified dealers appointed, serviced and contracted with by the Distributor in the states of Alaska, Washington, Oregon, California, and Hawaii, for a period of 2 years—two years from date hereof and *thereafter as this Agreement may be extended through mutual consent of the parties hereto.*
>
> . . . .

---

†Judge Soule is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

IV. GOVERNMENTAL SALES. In addition to the territory of the five states above named, the Distributor or its dealers may sell to the agencies of the United States Federal Government of the five states named, *and will be protected in their selling rights according to sales instigated by the Distributor.* (Italics ours.)

Under the contract Viking was to actually buy the articles and resell them for its profit rather than to be compensated by commissions.

Relations between the parties eventually came to an end though not precisely on October 9, 1962. By informal mutual agreement, manifested by letters in evidence, the relation continued into the month of February 1963, but after October 9, 1962, the relation was terminable at will.

By February 1, 1963, Viking owed Simonsen the sum of $16,404.28, for merchandise received but not paid for. This amount is not disputed, but Viking asserts a counterclaim based upon loss of profits from four sales which Simonsen allegedly made directly to the ultimate purchasers in violation of the agreement. Claims based on two of the sales were withdrawn during trial.

Additionally, Viking asserts that the contract provision protecting it on governmental sales "instigated" by Viking was violated to its damage by virtue of a direct sale by Simonsen to the United States Department of the Interior Fish and Wildlife Service, Bureau of Commercial Fisheries, in Seattle on March 7, 1963. This is the sale upon which Viking claims to have been working for more than a year prior to the unilateral termination of the distributorship agreement. For convenience we will hereafter refer to this customer as the Bureau of Fisheries.

The case was tried to a jury, but at the end of all the evidence the trial judge took the matter from the jury, granted judgment on the primary debt, and dismissed the cross complaint in its entirety. In so doing we believe that he was in error as to that portion of the counterclaim addressed to the sale to the Bureau of Fisheries and to that based on the transaction with one Nick Trutanich.

We will consider first the problem of the sale to the Bureau of Fisheries. Section IV of the distributorship contract, as previously noted, provides that the distributor and dealers will be protected in their selling rights according to sales *instigated* by the distributor.

The word "instigated" is an unusual one in this context. In The Oxford English Dictionary (1st ed. 1933), we find: "Instigate—to spur, urge on; to stir up, stimulate."

Whether the benefits of the protection clause can properly be applied to a sale "instigated" by Viking but not consummated at a time when Simonsen chose to terminate the contract relation was not discussed by the trial judge in his oral opinion. He rested his decision entirely on the ground that the contract had expired.

The subject of the sale was a unique electronic device not available from any source other than Simonsen. The eventual sale price was $163,500, so the dollar value of the sale made it of great interest both to Simonsen and to Viking. Its installation had to be carefully planned in advance in close correlation with the planning of the research vessel upon which it was to be installed. That this was known to Simonsen is shown by its letters of January 2 and 11, 1962, in which it recommended to Viking a course of action in seeking to get the equipment placed on a Bureau of Fisheries' vessel.

The details of the sales efforts Viking made from that time forward are not entirely clear, but by letter of January 24, 1963, Viking informed Simonsen that the call for bids would be issued soon. This letter further informed Simonsen that Viking had been working for the past year on the promotion of the sale.

No reply was received to the letter, but on February 21, Viking sent a cable to Simonsen asking for a price to be used as a basis for the bid. This was followed by another cable on February 25, noting that Viking had submitted complete specifications and drawings and that the customer wanted a firm price.

The reply received was a cable of February 28, 1963, in which Simonsen requested that Ted Jules, Viking's former

sales manager, go to the Bureau of Fisheries and get certain bid forms and airmail them to Simonsen.

In early March Viking's president, Mr. Isaacson, went to Oslo, Norway, to try to get the quotation. His requests for information were met with evasions. The requested price was never furnished and thus Viking could not bid. Simonsen submitted a direct bid which was successful.

■ The fact pattern here presented is very similar to that of *Hamilton v. C. L. Best Gas Traction Co.*, 123 Wash. 488, 494, 212 Pac. 1077 (1923). In that case the plaintiff was granted the exclusive right to sell defendant's products in certain parts of Eastern Washington and Northern Idaho. The contract contained provisions very similar to the one presently under consideration insofar as the method of buying and paying for the wares was concerned. It also contained a clause which permitted cancellation on written notice.

The plaintiff entered into negotiations with a prospective purchaser. Negotiations were protracted. The plaintiff notified defendant of the pending sale and kept it informed of the progress. Just before the sale was to be consummated defendant terminated plaintiff's contract.

We declined to permit the defendant to use its right to terminate to defeat the claim for compensation. This court said:

[A]s to sales of which plaintiff should become the efficient, procuring cause, consummated by the defendant even after the termination of the written agreement, following continuous negotiations from the time of the commencement thereof by the plaintiff, before termination of the agreement, until consummated by the defendant, this original written agreement should, as to such sales, be construed as an agency agreement so as to entitle plaintiff to compensation for the making of such sales, . . . .

In so doing we relied on cases which protect brokers who, having no fixed term of employment, are discharged in the midst of negotiations which are thereafter concluded directly by the principal. *Knox v. Parker*, 2 Wash. 34, 25 Pac.

909 (1891); *Norris v. Byrne*, 38 Wash. 592, 80 Pac. 808 (1905); *Lawson v. Black Diamond Coal Mining Co.*, 53 Wash. 614, 102 Pac. 759 (1909); *Merritt v. American Catering Co.*, 71 Wash. 425, 128 Pac. 1074 (1912); *Duncan v. Parker*, 81 Wash. 340, 142 Pac. 657 (1914).

In its brief Simonsen argues that the first notice Viking had of the request by the Bureau of Fisheries for bids was received by it on March 1, 1963. This position finds no support in the record in view of Viking's letter of January 24, 1963, and its cables of February 21 and 25, 1963.

We hold that, although Simonsen had the right to terminate the distributorship at will, and apparently did so in February of 1963, that as to the government sale then pending, it could not terminate Viking's right to compensation if Viking was the procuring cause of the sale. On the record before us, viewing the evidence and reasonable inferences therefrom in the light most favorable to Viking, we believe that this was a question for the jury.

The contract actually provides that Viking will be protected on sales instigated by it. If the record were more definite it might be possible to hold, as a matter of law, that Viking is entitled to compensation simply because it stimulated or spurred on the sale, even if its efforts were not the procuring cause, but the record is confused as to what specifically was done by Viking after it received Simonsen's letters of January 2 and 11, 1962.

The claim for damages from the sale to Nick Trutanich arises from the efforts of Viking and its San Pedro distributor, Benrad, to sell a commercial sonar installation to Nick Trutanich for use on his vessel, *Western King*. These efforts initially took place in the early months of 1961. Thereafter, in the fall of 1961, a sale of the equipment was made directly by Simonsen in Puerto Rico to Nick Trutanich for installation on the *Western King* in Panama. Simonsen's position, as evidenced by its brief, seems to be that the sale was to some other man of the same name and in any event, the eventual sale was made outside of Viking's territory. In disposing of this aspect of the case, and holding that there was no question for the jury, the trial court said:

. . . I would instruct the jury as a matter of law, if they did not complete the sale in their territory to Nick Trutanich, and the company succeeded in completing it to him outside the territory, to-wit, in Puerto Rico, outside the United States, eight months afterwards, that as a matter of law the company was not prevented from selling to a customer simply because Viking had negotiated with that customer.

█ In reasoning that there was no question of fact for the jury, the learned trial judge perhaps overlooked the import of certain correspondence and oral testimony concerning this sale, which for the purposes of the motion, must be considered in the light most favorable to Viking. *Fannin v. Roe*, 62 Wn.2d 239, 382 P.2d 264 (1963).

The correspondence reveals a sequence of communications from which the jury could well conclude that for the purposes of this sale Simonsen enlarged the territorial rights of Viking to include Puerto Rico; that in so doing Simonsen undertook not to deal directly with Trutanich; and that it thereafter violated its undertaking to Viking by dealing directly and secretly with Trutanich.

On January 5, 1961, Mr. Hallre, Simonsen's sales director, wrote directly to Benrad in San Pedro complimenting them on their extensive promotional and developmental work with the San Pedro tuna fleet and making special note of the work done aboard a vessel called the *Sea Pride* of the Star-Kist organization. In closing he said:

> put up the goal: Simrad Asdic on all tuna clippers in your area. Thereafter you discuss how to reach this goal and what is necessary to invest of work and money.
>
> Viking Equipment in Seattle and the whole Simrad-organization will be at your disposal and will assist you in all ways.

A copy of this letter went to Viking in Seattle, and by it Simonsen clearly recognized that the development of the market required the investment of time and money, a fact which was implicit in the Simonsen-Viking contract.

On February 6, 1961, Mr. Jules, the sales manager of Viking, wrote to Simonsen reporting on sales activities in the San Pedro area, and closing with:

We personally know of eleven orders that may come any time, one of them for the "Western King", a 600-ton tuna clipper which is going in dry dock March 1-5th. We have been requested to stand by for that order today and if favorably decided upon, we hope you have a set available to ship immediately to New York from where it will continue to San Diego to meet the deadline for dry docking March 1-5th.

Concerning these negotiations, Mr. Jules testified that he went to San Pedro and, with a Benrad representative, negotiated with Trutanich. He testified as follows:

We entered into conversations with the owner of the vessel, or the part-owner of the vessel, Western King, and Nick Trutanich, as he was known, definitely indicated some interest in the Model 580-4 which was known more specifically as a Sonar Model. . . . He said he had to confer further about the purchase of such equipment and the price with his partner, whom he did not identify. A little bit later, a few days later, it was known that he did have the authority to negotiate for the sale and consequently a contract was drawn up between the Benrad Company, as the dealer, and Viking Equipment Company, as distributor, with Nick Trutanich, and he agreed to certain terms, but he refused to sign the contract before it had been submitted by himself to his superiors.

In the meantime, he developed an objection to the duty. Someone had evidently informed him about equipment such as this being duty-free in certain Latin American countries and he indicated the purchase might come from some other source, and that was the last we heard from Nick Trutanich at that time . . . .

As a result of that experience, Viking wrote to Simonsen on March 27, 1961, suggesting the possibility of some arrangement whereby Viking could have authority to act in Mexico. Among other things, the letter said:

A number of the boatowners in Southern California, whom we have contacted in connection with installation of a model 580-4 in their Tuna clippers, have indicated that they may get the equipment duty free in a free port such as Salina Cruz, or in Puerto Rico. Mr. Nick Trutanich, owner of the "Western King" of San Pedro, cancelled

his order for the 580-4 from Benrad, Inc. and expressed the idea and hope that a set would be available to him at any other port of call outside U.S.A., and mentioned Mexico as first choice, or Puerto Rico or Guana, West Africa.

Should that be possible for him, it will of course have some detremental [sic] effect on our Simrad sales of the 580-4 to the American Tuna fleet.

For this reason, we shall appreciate your views, opinion, and decision relative to this matter which was discussed hurriedly with your Mr. Knudsen with the idea of his relating the situation for further discussion with you.

By coincidence on that very same day Simonsen sent a letter to Mr. Trutanich at a Puerto Rico address:

We refer to letter from Western King Co., Inc. dated March 21st regarding eventual delivery of Simrad Sonar, Model 580-4 directly to your company in Puerto Rico.

As this is a way of distribution we usually do not practice, we have to discuss the matter with our sales manager, who at present is out of town.

We therefore will revert to the matter in a few days.

In the meantime, we remain,

> Yours very truly,
> per. Simonsen Radio A/S.

A copy of this letter was eventually sent to Viking, but not until more than a month had elapsed. On May 9, 1961, Simonsen wrote to Viking, and in a letter well calculated to reassure them that there would be no direct dealings, said:

*Western King*

Let us first of all stress that there is not possible to buy Simrad equipment in Puerto Rico at present. We have no dealer there and no committments, [sic] only a service station which is included in the Simrad World-Wide Service list: Radio Corporation of Puerto Rico, P. O. Box 3746, San Juan—Telephone 2-2134.

Since we asked them if we could include their name in our service-list, we have not heard from them any more, and it is likely to believe that they never have been asked to service any Simrad instruments on boats calling on Puerto Rico.

We are thus free to do what we want *and you need not worry at all. We only have to find the best arrangement for all parts involved.*

As previously mentioned we received a letter from Western King Company, Inc. of Ponce, Puerto Rico dated March 21st. *We certainly were aware of the fact that this company belongs to the Star-Kist organization* and therefore we only gave them a short reply according to the enclosed copy.

We very well understand Star-Kist that they want to avoid paying duty for their ships sailing under the Puerto Rican flag. We do not know if they also intend to have their US-flagged ships equipped in Puerto Rico, and if they in that way can avoid paying duty. It might work. We know that for instance Norwegian merchant vessels do not pay duty in Norway if they have an echo sounder installed abroad. But the letter from Western King Co., Inc. indicates that they want to short-cut also you, and they certainly would like to be smart.

Well, it is a fact that a purchaser by feeling smart, is the best buyer you can have, because feeling smart means happiness and satisfaction.

*As we have no special expectations as to the Sonar and echo sounder market in Puerto Rico, we will suggest that you step in and arrange the whole business through a local company.* Star-Kist might be disappointed if they find out, therefore we will recommend you to operate secretly.

On the other side, if Star-Kist would be contented with a 20% discount equivalent to the duty, it is no idea to make a secret out of it at all. *We will also suggest that the local dealer (Benrad) obtain a commission according to their sales efforts and service responsibility.*

We therefore look forward to receiving your comments in the matter. (Italics ours.)

From this letter, signed by Hallre, it is apparent that Simonsen was not in doubt as to the identity of the prospect and recognized Trutanich as Viking's and Benrad's customer. Simonsen even authorized Viking to operate outside its assigned territory, if necessary, to procure the sale. More than that, the reference to the Trutanich letter of March 21, and its reply to him indicating that they did not

usually make direct sales, when read with the language "you need not worry at all" warranted Viking in assuming that Simonsen was protecting the integrity of its distribution program by refusing to deal directly.

What further sales efforts were made by Viking and Benrad between then and October is not clear, but that the direct sale was made to a customer whose business was well rooted in California is shown by the letter of October 17, in which Benrad wrote to Viking as follows:

> Nick Trutanich of the Western King dropped in today and said that he expected shipment of a Simrad 580-4 from Oslo-to be delivered in Panama about October 22nd. He expects the 'Western King' to be in Panama about Oct. 25th.
>
> We were quite surprised to get the news from him as he understands someone from Benrad would be down in Panama to supervise installation. He proposes to pay 1/2 of air fare. We are ignorant of details on this deal and would appreciate hearing details so that we can speak intelligently to Nick Trutanich. Nick will be in San Pedro until Thursday or so of this week.
>
> Would you kindly bring us up to date on this deal? Your immediate reply is requested.

On receipt of this inquiry Viking cabled Simonsen as follows:

> Nick Trutanich presently San Pedro claims he has ordered 580-4 from Oslo for delivery Christobal October 22. He is negotiating with Benrad for installation Panama. Benrad inquires about authenticity of order. Since we have had no advice such order we assume someone is mistaken. Shall appreciate your information or confirmation of assumption that we may advise Benrad accordingly.

Apparently Simonsen replied to the cable by telephone and acknowledged the direct sale, because on October 24, Viking wrote to Simonsen sharply protesting its action. Reference was made to the letter received from Benrad with whom Trutanich had been negotiating and closed with Viking's statement of its position:

> Accepted U.S. sales policies dictate that dealers in whose territory the sales or purchasing headquarters are located

are entitled to the protection. However, if the delivery and installation takes place in a territory other than his own, a reasonable 5 to 10% is forfeited for installation supervision and service to the dealer in the territory of such installation and service of equipment.

We sincerely trust that you will give the matter your immediate and serious consideration and advise us promptly of your decision. In the meantime we hope for a favorable reply to avoid at this time a trip to Oslo in order to bring the matter to a mutually agreeable solution.

No settlement was made at that time; thereafter, officers of Viking attended a conference in Norway which resulted in the supplemental agreement of December 6, 1961. That agreement states:

For the purpose of eliminating any misunderstanding in future sales of Simrad equipment in American owned boats from a West Coast port with a Puerto Rican or Panamanian registry, and to promote sales with the co-operative assistance of all concerned, it is proposed that the West Coast distributor and their dealers be protected by maintaining the West Coast listprices [*sic*] with a pricereduction [*sic*] for duty and freight not to exceed 15% from the West Coast price list.

This agreement does not, by its terms, settle any past controversy. Mr. Isaacson, president of Viking, after recounting that he went to Norway in December of 1961, concerning this matter, testified: "[Y]ou went there, wasn't it, because of the Western King? A. Because of the Western King, yes. Q. And at that time you signed an agreement, is that correct? A. Yes. Q. And at that time you settled any arguments you had with respect to Western King, isn't that right? A. *No, sir*." (Italics ours.)

Mr. Jules was also in Norway at the time. He testified on cross-examination concerning the agreement of December 6: ". . . and it was understood, I believe at that time, that it would be retroactive to the Trutanich deal, which did not prove to be the case."

Notwithstanding the foregoing, the position of Simonsen is that the sale was not made in the territory covered by

the contract and that it was not made to the same Nick Trutanich with whom Viking and Benrad were dealing in San Pedro. Simonsen's sales director, Mr. Hallre, testified as follows concerning this sale: "But later it was proved it was not this Nick Trutanich, but was another man by the same name." And, "No, he was not the original buyer. This was a Puerto Rican company and this Nick Trutanich from California was not the same man, as I recall."

It appears to us that there was sufficient evidence to warrant submission of the matter to the jury upon the question of whether or not the sale was to the same Nick Trutanich with whom Viking and Benrad dealt in San Pedro and whether or not their efforts were the procuring cause of the sale.

■ Because of the language in the letter of May 9, it also appears to us that there was a jury question as to whether or not the rights under the contract which were enjoyed by Viking were modified and extended to Puerto Rico for the purpose of this sale.

We recognize that, as a general rule, a distributor with a contract such as that under consideration in this case, has no claim for commissions, discounts, or damages, where a sale in which he has had no part is made outside of his territory, even though the customer resides therein and may even thereafter bring the chattel into the territory. See Annotation 12 A.L.R.2d 1360; 3 C.J.S. *Agency* § 179.

But, where as here, the distributor is required by his contract to spend time and money to develop the market for the benefit of his principal, and in fact does so; where he does in fact, with his dealer engage in substantial negotiations with a customer; where the principal has recognized the prospect as the customer of his distributor and dealer; where the distributor is led to believe by his principal that there will be no direct dealings, and then without further notice to the distributor, the principal does deal directly; where it does not conclusively appear that the distributor and dealer have terminated their sales efforts; where circumstances make permissible the inference that

the efforts of the distributor and dealer were the procuring cause of the sale; and, where the principal has waived the territorial restriction in the contract and has authorized pursuit of the sale in the territory where the sale is actually made, we think a jury question is presented, notwithstanding the fact that the sale and delivery of the goods is made at a point outside the regularly assigned territory.

The trial judge was impressed by the fact that there had been a lapse of some months between the original negotiations and the actual sale, but in a case such as this where the product is complex, new to the market, somewhat untried and expensive, and where the owner and the vessel are apparently absent from the area from time to time, negotiations well may be protracted and intermittent. Whether the original negotiations should be deemed ended merely because of the lapse of time seems properly to present a question of fact.

In addition, the jury might well consider the Simonsens' communicated assurances that they would not sell direct as justifying any temporary inactivity in pursuing the sale. Certainly, after giving such assurances it seems to us that if Simonsen wished to change its position it owed a duty to speak and to affirmatively advise Viking of its change. *Hanson v. Puget Sound Nav. Co.*, 52 Wn.2d 124, 323 P.2d 655 (1958).

The jury might even infer from the circumstances that Trutanich and Simonsen dealt directly, not only for the purpose of saving the duty, but insofar as Simonsen is concerned, for the additional purpose of cutting Viking and Benrad out of the discounts to which they otherwise would have been entitled. Such a purpose was termed fraudulent in *White Co. v. W. P. Farley & Co.*, 219 Ky. 66, 292 S.W. 472, 52 A.L.R. 541 (1927).

We do agree with the trial judge that even viewing the evidence in the light most favorable to the non-moving party, there was no substantial evidence upon which to base a claim for recovery of damages for the Schmidt sale.

As to the Schmidt sale, the judgment of dismissal will be

92

affirmed; as to the Trutanich and Bureau of Fisheries sales, the judgment of dismissal is reversed with direction to grant a new trial on all issues.

ROSELLINI, C. J., HILL, OTT, and HALE, JJ., concur.