**INDUSTRIAL REPRESENTATIVES, INC., Plaintiff–Appellant,**

v.

**CP CLARE CORPORATION, Defendant–Appellee.**

No. 95–2555.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1995.

Decided Jan. 3, 1996.

John T. Schriver, Jonathan I. Flaum (argued), McDermott, Will & Emery, Chicago, IL, for Industrial Representatives, Incorporated.

Anthony M. Feeherry (argued), Robert N. Driscoll, Goodwin, Procter & Hoar, Boston, MA, Paul J. Cherner, Michael, Best & Friedrich, Chicago, IL, for CP Clare Corporation, a Massachusetts corporation.

Before EASTERBROOK, RIPPLE, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

CP Clare Corporation, a manufacturer of electrical components such as relays and surge arrestors, engaged Industrial Representatives, Inc. (IRI) in April 1991 to solicit orders for its products in Northern Illinois and Eastern Wisconsin. As its name implies, IRI touts the products of many firms; its sales staff offers a menu of goods, achieving economies of scale for manufacturers too small to support a dedicated sales staff. Successful manufacturers eventually reach that critical size, however, and may elect to change distribution channels. By fall 1994 CP Clare's sales in IRI's territory exceeded $6 million annually, a tenfold increase since IRI's engagement. CP Clare decided to take promotion in-house and sent IRI a letter terminating its role at the end of October 1994. CP Clare gave IRI 42 days' notice; the parties' contract required only 30. The contract established a further obligation: CP Clare had to pay IRI a commission for all products, ordered before the terminal date, that were delivered in the next 90 days. CP Clare kept this promise. But IRI believes that it has not been paid enough for the work it did in boosting CP Clare's sales. It filed this suit under the diversity jurisdiction seeking commissions for all products delivered through 1999, plus $5 million in punitive damages.

IRI acknowledges that CP Clare did not need good cause to bring their dealings to a close. The contract provides that Illinois law governs, and in Illinois a contract without a fixed term may be ended for any or no reason. *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 993, 137 Ill.Dec. 494, 502, 546 N.E.2d 248, 256 (4th Dist.1989); see also *LaScola v. US Sprint Communications,* 946 F.2d 559, 563–67 (7th Cir.1991) (Illinois law). Nonetheless, IRI insists, CP Clare was not entitled to take opportunistic advantage of the situation created by the parties' dealings. By "opportunistic" IRI means any decision by which, after one party has made investments, the other breaks off the transactions to appropriate more of the gain these investments brought into being. IRI's services created goodwill for CP Clare's products, and anticipated future sales were like an annuity that CP Clare decided to capture. An obligation to avoid opportunistic advantage-taking is part of the duty of good faith read into every contract in Illinois, IRI submits. The district court disagreed and dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted. 1995 WL 348049, 1995 U.S.Dist. LEXIS 7810 (N.D.Ill.).

"Opportunism" in the law of contracts usually signifies one of two situations. First, there is effort to wring some advantage from the fact that the party who performs first

sinks costs, which the other party may hold hostage by demanding greater compensation in exchange for its own performance. The movie star who sulks (in the hope of being offered more money) when production is 90% complete, and reshooting the picture without him would be exceedingly expensive, is behaving opportunistically in this sense. See *Alaska Packers' Ass'n v. Domenico,* 117 F. 99 (9th Cir.1902). See also Varouj Aivazian, Michael Trebilcock & Michael Penny, *The Law of Contract Modifications: The Uncertain Quest for a Benchmark of Enforceability,* 22 Osgoode Hall L.J. 173 (1984); Timothy J. Muris, *Opportunistic Behavior and the Law of Contracts,* 65 Minn.L.Rev. 521 (1981). Second, there is an effort to take advantage of one's contracting partner "in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990). For example, we concluded in *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429 (7th Cir.1987), that a firm and its employees had neither contemplated nor resolved by contract the question whether news of an impending merger would be provided to employees considering whether to leave the firm, and that the common law rule requiring disclosure of information pertinent to securities transactions in closely held firms therefore remained in force. The court did not doubt in *Jordan* that an express agreement would control. See also *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588 (7th Cir. 1991).

IRI does not allege that CP Clare acted opportunistically in either of these fashions. CP Clare did not seek to improve the deal to take advantage of IRI's sunk costs; rather it sought to enforce the bargain. And it did not take unexpected action against which IRI could not have defended. That a manufacturer will want to reassess its sales structure as volume grows must be understood by everyone—especially by a professional sales representative such as IRI. No one, least of all IRI, could have thought that a contract permitting termination on 30 days' notice, with payment of commissions for deliveries within 90 days thereafter, entitled the representative to the entire future value of the goodwill built up by its work. Goodwill (beyond the 90–day residual) was allocated to the manufacturer. The terms on which the parties would part ways were handled expressly in this contract, and IRI got what it bargained for. Contracts allocate risks and opportunities. If things turn out well, the party to whom the contract allocates the upper trail of outcomes is entitled to reap the benefits. See *Continental Bank, N.A. v. Everett,* 964 F.2d 701 (7th Cir.1992) (Illinois law); *Hentze v. Unverfehrt,* 237 Ill.App.3d 606, 611, 178 Ill.Dec. 280, 283, 604 N.E.2d 536, 539 (5th Dist.1992) (citing *Kham & Nate's Shoes* with approval).

Allocating risks by contract is no easy matter, and only a long process of experimentation in the marketplace reveals the best terms. Consider the variables in a sales agency such as this one. Cf. *Kirchoff v. Flynn,* 786 F.2d 320, 324–26 (7th Cir.1986). The parties must select the length of the relationship, the commission rate, any bonuses for meeting objectives, and post-termination compensation. A long term, with termination only for cause, will assure the agent that it can reap the benefits of success in procuring repeat buyers for the goods—but disputes about "cause" may lead to costly litigation, and the longer term eventually may stifle effort. As the end of the term approaches, the agent cannot obtain much of the gain and may begin to take it easy, the "last-period problem" well known to contracting parties. Instead of rewarding the agent through a longer term, the parties may choose a higher commission rate. This increases the agent's incentive to work hard, but the higher rate also may over-reward the agent for sales that would have occurred without the agent's efforts; and a high commission rate gives the principal a greater reason to replace the agent. That incentive may be alleviated by paying the agent a bonus for defined levels of success, such as landing a big contract, but a bonus is risky for both sides—and as most people want to avoid risk, the prospect of a large bonus may be worth less to the agent than the cash outlay to the principal. Thus the parties may prefer to compensate the agent by a

share of the profits over time, even after the agency is over. Stock options may do this; so do post-termination commissions. But back-loading of the compensation, like a long-term contract, creates incentives to shirk; for if the agent makes a big sale he can collect his residuals and invite the principal to fire him so that he can turn to other projects. All of the provisions for creating incentives and allocating risks have their advantages and disadvantages; all are well known to professionals such as IRI and CP Clare; no one combination of these terms is right for all people at all times.

CP Clare and IRI addressed most of these issues explicitly in their contract. IRI received a minimum term of one year; either party could walk away on 30 days' notice thereafter. The contract set a commission rate of 6% for some products and 4% for others, but it provided a lower 2% rate on sales exceeding $500,000 per year to a single customer—except in the first year of sales to that customer, when IRI would collect its full commission rate. The contract did not provide for bonuses, and it tackled residuals by providing that IRI got its full commission on all deliveries within 90 days following its termination—unless IRI breached the contract, in which case it would receive no residuals. This agreement provides explicitly for what has come to pass: termination with substantial outstanding business. It allocates to IRI three months' worth of commissions. By demanding five years' worth after the fact, IRI has behaved opportunistically.

According to IRI, Illinois does not honor the parties' allocation of risks. It relies on cases under the Illinois Franchise Act. But the Franchise Act is designed to override contracts; for example, it creates a "cause" requirement whether the parties want one or not. 815 ILCS 705/19; see *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 992, 81 Ill.Dec. 156, 171, 466 N.E.2d 958, 973 (1st Dist.1984). IRI does not claim to be a franchisee. Its dealings with CP Clare are governed in part by the common law of contracts—which in Illinois permits at-will arrangements and respects the parties' allocations, see *Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105, 112, 187 Ill.

Dec. 827, 833, 618 N.E.2d 418, 424 (1st Dist. 1993); *Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927 (N.D.Ill.1985) (summarizing Illinois law)—and in part by the Sales Representative Act, 820 ILCS 120. The Sales Representative Act does not specify the price or duration of sales agency contracts. To the contrary it says that, with respect to the time of payment, the only subject the state legislature has sought to regulate, "[t]he terms of the contract between the principal and sales-person shall control." 820 ILCS 120/1(2)(A). *Hentze* held that the terms of a sales agency contract control even in the face of a charge of opportunism, and we are confident that *Hentze* represents the position the Supreme Court of Illinois would take on that question. Many cases in Illinois hold sales representatives to agreements that terminate the flow of commissions before the common law would do so. E.g., *Heavey v. Ehret*, 166 Ill. App.3d 347, 116 Ill.Dec. 781, 519 N.E.2d 996 (1st Dist.1988); *Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 792–93, 90 Ill. Dec. 558, 562, 482 N.E.2d 377, 381 (1st Dist. 1985). Or consider the "procuring cause" rule, which entitles a real estate broker who has found a customer to a commission, even if the principal fires the broker and completes the transaction independently. In Illinois the parties may abolish or modify this entitlement by contract. E.g., *Harold Wright Co. v. E.I. Du Pont De Nemours & Co.*, 49 F.3d 308, 310 (7th Cir.1995) (Illinois law); *Schackleton v. Federal Signal Corp.*, 196 Ill.App.3d 437, 444, 143 Ill.Dec. 309, 313–14, 554 N.E.2d 244, 248–49 (1st Dist. 1989). See also *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1327–28 (7th Cir. Dec. 13, 1995), (same under Ohio law, but discussing Illinois law too). *Hentze* is consistent with these and many other cases that allow brokers and other agents to regulate by contract the sums they receive for transactions initiated while the agency lasted; and if they may agree to accept less for completed sales, they may allocate to the principal the full benefit of the goodwill (that is, the prospect of future sales) created by their labors.

When the parties are free to specify price and duration, a court cannot improve

matters by intervention after the fact. It can only destabilize the institution of contract, increase risk, and make parties worse off. "The idea that favoring one side or the other in a class of contract disputes can redistribute wealth is one of the most persistent illusions of judicial power. It comes from failing to consider the full consequences of legal decisions. Courts deciding contract cases cannot durably shift the balance of advantages to the weaker side of the market. They can only make contracts more costly to that side in the future, because [the other side] will demand compensation for bearing onerous terms." *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 282 (7th Cir. 1992). Parties to contracts are entitled to seek, and retain, personal advantage; striving for that advantage is the source of much economic progress. Contract law does not require parties to be fair, or kind, or reasonable, or to share gains or losses equitably. See *Jordan,* 815 F.2d at 438–39. It does require parties to avoid taking advantage of the opportunities that arise from sequential performance, when the contract itself does not cover a particular subject. But the subject of this case—how long IRI's stream of commissions would last after termination—was covered explicitly. IRI was the repeat player in this arrangement, CP Clare the newcomer with small initial sales. IRI knew, or should have recognized, that the 90–day period created a risk; and it could have responded by demanding a higher commission rate to compensate. For all we know, the commission rate in this contract *was* higher than it would have been, had the period of post-termination residuals been longer. But whether the commission rate adjusted or not, a deal's a deal.

AFFIRMED.