[No. 38366-3-I. Division One. February 9, 1998.]

ROBERT SYPUTA, *Appellant*, v. DRUCK, INC., *Respondent*.

*Paul Lehto*, for appellant.

*Randall Gainer* of *Davis Wright Tremaine*, for respondent.

GROSSE, J. — Despite the complexity of the procurement process in the aerospace industry, sales representatives for the parts manufacturers that an airframe manufacturer selects for participation in a particular program are entitled to commissions on orders for which they are the procuring cause. As with other industries, the standard for the procuring cause doctrine in the aerospace industry is activity that sets in motion the chain of events or negotiations culminating in a sale. Accordingly, manufacturers' sales representatives may receive posttermination commissions if they can demonstrate that their work was the procuring cause for product orders placed under a long-term requirements contract. We reverse the trial court's order dismissing Team Associate's procuring cause claim. Material issues of fact remain to be resolved on this issue.

## FACTS

In February 1990, Team Associates agreed to act as aerospace manufacturing representative for Druck Incorporated (Druck). Previously, Druck had failed to obtain a long-term contract from Boeing and it wished to utilize Team Associates' expertise to do so. Immediate sales to Boeing by aerospace manufacturers' representatives are

not contemplated in this type of arrangement because there is an arduous and time-consuming process involved in becoming a supplier for Boeing. For customized products, the general procedure is to get on a bidder's list and submit proposals. If a proposal is initially acceptable, Boeing will ask for specialized product design. Then, if the product and supplier qualifies, Boeing may place orders under its requirements contracts. Boeing engages in extensive review before approving a product and a manufacturer's engineers propose different designs during this review. A manufacturer's representative who has technical expertise and is familiar with Boeing can play a vital role in navigating this procurement process. Once Boeing has granted a subcontractor a contract for a part to use in an airplane program, the manufacturer is practically guaranteed to continue providing the part for several years if the manufacturer continues to perform.

The contract for representation of Druck by Team Associates was memorialized in Spring 1990. The agreement granted Team Associates exclusive representation for specified "product lines" of aerospace products within Washington. Team Associates' employment was at will, with only one provision addressing the contract's term:

> Druck Inc. guarantees the line to Team Associates for a full 12 months from the above date unless at an interim date it should be mutually agreed to break the arrangement . . . . This contract will automatically continue beyond the above date unless otherwise terminated in writing by either party with a minimum notice of 30 days.

The agreement specified: "Commission will be payable at the beginning of the month following the customer payment" and it established:

4. All orders received will be subject to the following commission schedule:

a) Fifteen percent (15%) on all transducers (PDCR), transmitters (PTX), and also the DPI 260 and 700 series instruments when priced at list price . . . .

b) Ten percent (10%) on all other instrument (DPI) products when priced at list price . . . .

c) For custom products, O.E.M. and other discounted prices, the standard commission will be 10% and 7 1/2% for a) and b) respectively. However, if special pricing is required for competitive reasons, we reserve the right to negotiate commission on a per account basis. This will be agreed at the time of putting in our bid.

. . . .

h) In the event of an order being received as a result of representative effort being made in more than one territory commission will be split between the appropriate representative companies. The level of this split commission will be determined by Druck Inc. at the time of order placement.

Appended to the agreement is a list of aerospace/military products covered by the agreement.

By introducing Druck officials to key Boeing officials, by facilitating communications between Druck and Boeing, and by providing Boeing with requested information, Team Associates assisted Druck in obtaining a contract for hydraulic transducers. In July 1992, Boeing placed its first production purchase order for hydraulic transducers for use on Boeing 777 airplanes. While Druck's contract with Boeing is a requirements contract, Boeing is not obligated to purchase any specific number of parts from Druck. In early 1993, Team Associates started trying to sell to Boeing another Druck product, an oxygen transducer. By November 1993, Druck had started the qualification process to provide the product to Boeing. However, in December 1993, Druck terminated Team Associates' at will contract. Nevertheless, Boeing approved Druck as a direct supplier for oxygen transducers in December 1994.

Druck paid Team Associates commissions on orders placed by Boeing before the termination date, but it did not pay commissions for orders received after that date. Under the representation agreement's commission schedule, the

commission rate for both transducer products was 10 percent.

Team Associates brought claims against Druck for breach of the representation agreement, for unjust enrichment, and for withheld wages under RCW 49.52. Later Team Associates moved to add additional equitable claims and a claim for negligent misrepresentation. This motion was denied. Team Associates moved for partial summary judgment on its claim for commissions on the hydraulic transducers. Druck moved for complete summary judgment dismissing all of Team Associates' claims. In March 1996, the trial court granted summary judgment in favor of Druck. Team Associates appeals the dismissal of its partial summary judgment motion and the granting of Druck's summary motion.[1]

## ANALYSIS

Representation Contract

Team Associates claims that under the terms of the contract, Druck owes it posttermination commissions. However, while the representation contract provides that commissions will be paid following customer payment and provides for at will employment, significantly, it does not provide specific terms addressing posttermination commissions. Nonetheless, Team Associates contends that under the contract it was to receive commissions on the signing of long-term contracts, such as the hydraulic transducer requirements contract, and not based on the placement of individual orders. The contract language does not support this construction. The contract speaks in terms of "orders" and refers to specific products that are listed in the appendix. No terms in the contract suggest that commissions

---

[1]In its complaint, Team Associates sought posttermination commissions for sales of three products: air data test sets (ADTS), hydraulic transducers, and oxygen transducers. In its request for relief, Team does not mention ADTS. Accordingly, we will view Team Associates as not pursuing this issue.

are triggered by the securing of a requirements contract alone.

■■ Although Team Associates asserts that the parties mutually intended to define the placement of orders as meaning the placement of requirements contracts, the record is devoid of evidence that the parties *mutually* intended such a definition. The only written evidence (other than Team Associates' officers' self-serving declarations) that Team Associates asserts supports its interpretation is a January 1990 preagreement letter stating:

> We would very much like to work with Druck to develop business at Boeing and other accounts. The prospects for increasing business to support existing aircraft and new aircraft, such as the B-777, is exciting. Joe Baranowski and I [Robert Syputa] are willing, ready and able to contribute to your efforts to win immediate and long-term sales.

This letter is only a general statement made before the award of the representation contract and does not inform as to the parties' intended definition of terms.

The evidence, the letter and the declarations, merely reflects Team Associates' unilateral or subjective intentions as to what it intended the contract to mean. This is not useful because only evidence of mutual intent may be used to interpret a contract.[2] In short, Team Associates has not provided evidence that the parties mutually intended that the word "orders" meant "requirement contracts" or other long-term contracts.

■ ■ Team Associates also asserts that the parties agreed to additional oral terms during their contract negotiations, and that Druck

> recognized the longevity of the effort needed to obtain business at Boeing and agreed to pay in response to that accordingly as is the custom in the industry for long-term procurements made under those agreements between Druck and Boeing.

---

[2]*U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 570, 919 P.2d 594 (1996).

We will not consider Team Associates' assertions as to the presence of additional terms based on the industry standards because these terms would vary the terms of the contract. Parol evidence cannot be used to add provisions to written contracts.[3] While extrinsic evidence is admissible to interpret contracts and to determine intent, that evidence cannot be used to vary the terms of the contract.[4] Evidence is admitted to " 'elucidat[e] the meaning of the words employed' " not " 'for the purpose of importing into a writing an intention not expressed therein.' "[5]

In summary, given the lack of terms addressing posttermination commissions, the trial court did not err in granting summary judgment in favor of Druck on the contract claim.

Procuring Cause

While Team Associates' contract argument fails, the claims that it is entitled to posttermination commissions under the procuring cause doctrine are more persuasive.

 Although a manufacturer has the right to terminate an agent at will, it cannot terminate an agent's right to compensation if he or she caused the sale.[6] This is the procuring cause doctrine. This rule is inapplicable only if a written contract expressly provides "how commissions will be awarded when an employee or agent is terminated."[7] In the absence of a contractual provision specifying otherwise,

---

[3]*Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990).

[4]*Williams*, 129 Wn.2d at 569-70.

[5]*Lynott v. National Union Fire Ins. Co.*, 123 Wn.2d 678, 683, 871 P.2d 146 (1994) (quoting *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 349, 147 P.2d 310 (1944)).

[6]*See Zelensky v. Viking Equip. Co.*, 70 Wn.2d 78, 82-83, 422 P.2d 293 (1966). *See also Willis v. Champlain Cable Corp.*, 109 Wn.2d 747, 755, 748 P.2d 621 (1988); RESTATEMENT (SECOND) OF AGENCY § 454 (1958); *Harold Wright Co. v. E.I. DuPont De Nemours & Co.*, 49 F.3d 308, 310 (7th Cir. 1995).

[7]*Willis*, 109 Wn.2d at 755.

the procuring cause doctrine acts as a gap filler.[8] Here, the at will representation agreement did not contain contractual provisions addressing posttermination commissions. Thus, the procuring cause doctrine applies.

Druck argues that to prove procuring cause in the aerospace manufacturing industry, the agent must show that he or she was the definitive cause of the sale, essentially proposing a "but for" test. Druck justifies this test by pointing to the complexities of becoming a supplier of manufacturing aerospace products and the many factors involved in the buyer's decision to select a supplier that are beyond the control of the manufacturing representative. Druck relies on *Poggi*, a case involving a manufacturing representative's posttermination commissions for products sold to Boeing, in which the manufacturers' representative gave an extraordinary amount of effort to accomplish a sale. The representative not only facilitated communication between Boeing and the manufacturer, but he also provided engineering insights into how to adapt the product.[9]

Druck proposes that the facts of *Poggi* establish a standard for the burden of proof necessary to prove that a sales agent was the procuring cause of an order in the aerospace industry. We disagree in part. Although a "but for" effort necessarily makes a manufacturing representative's case easier to prove, such a test is not mandated by the procuring cause doctrine. The standard for the procuring cause doctrine is activity that sets in motion the chain of events or negotiations culminating in a sale.[10] Thus, an agent receives commissions on sales when the sales "resulted from the agent's efforts."[11] Moreover, whether a given

---

[8]*Industrial Representatives, Inc. v. CP Clare Corp.*, 74 F.3d 128 (7th Cir. 1996). *See Zelensky*, 70 Wn.2d at 82; *Hamilton v. C.L. Best Gas Traction Co.*, 123 Wash. 488, 212 P. 1077 (1923).

[9]*Poggi v. Tool Research & Eng'g Corp.*, 75 Wn.2d 356, 451 P.2d 296 (1969).

[10]*Roger Crane & Assocs., Inc. v. Felice*, 74 Wn. App. 769, 777, 875 P.2d 705 (1994) (citing *Staubus v. Reid*, 652 S.W.2d 293 (Mo. Ct. App. 1983)).

[11]*Willis*, 109 Wn.2d at 754.

result would not occur "but for" a given cause is more a conclusion than a useful test.

Team Associates has met its burden to demonstrate an issue of material fact as to whether it was the procuring cause of the hydraulic transducer requirements contract.[12] For the purposes of summary judgment, evidence establishes that Team Associates fulfilled its role as a manufacturing representative by promoting the sale of the hydraulic transducers, by bringing Druck's product to Boeing's attention and by assisting the coordination of communications about specifications between Boeing and Druck. Indeed, according to the president of Druck, Team Associates met Druck's expectations as to what sales agents should be accomplishing at Boeing. Significantly, Team Associates assisted Druck in getting on the initial bidder's list. This was a noteworthy accomplishment because at that time Boeing was reducing its number of new suppliers and Druck had not had a long-term contract with Boeing.

Druck argues that Team Associates is not the procuring cause of the hydraulic transducer contract as a matter of law because a Boeing buyer testified that he selected Druck for pricing reasons. We cannot agree. Even if other factors contribute to a sale, that does not necessary preclude a finding of procuring cause.[13] The agent is responsible for acquiring a contract within the scope of its agency: "Application of the 'procuring cause' doctrine depends on a determination of the intentions of the parties to the agency

---

[12]*See Felice*, 74 Wn. App. at 776.

[13]For example, the independent factor of finding favorable financing that allows a deal to be consummated is not held to defeat the broker's claim that he or she procured the sale. *E.g.*, *Professionals 100 v. Prestige Realty, Inc.*, 80 Wn. App. 833, 842, 911 P.2d 1358 (1996). The scope of the broker's agency is to introduce the seller to the ready and willing buyer. This is why the presence of the broker is not required at the ultimate negotiations of the contract, *e.g.*, *Feeley v. Mullikin*, 44 Wn.2d 680, 269 P.2d 828 (1954); *Sevener v. Northwest Tractor & Equip. Corp.*, 41 Wn.2d 1, 18-19, 247 P.2d 237 (1952); *Bonanza Real Estate, Inc. v. Crouch*, 10 Wn. App. 380, 385, 517 P.2d 1371 (1974), and by extension is not responsible for the ultimate terms of the deal.

relation."[14] Team Associates has provided evidence that Druck precluded Team Associates from involvement in the pricing of its bid. It may argue on remand that pricing was not within the scope of its agency and that pricing was not the procuring cause for the requirements contract.

Finally, Druck argues that Team Associates could not be the procuring cause of the oxygen transducer order because Boeing approved Druck as a direct supplier only for that part of year after Team Associate's termination. The evidence of procuring cause for the oxygen transducers contract is not as strong as that for the hydraulic transducers. However, Team Associates worked on this project before its termination and issues of material issues of fact exist with respect to this contract as well.

In summary, we remand for the trier of fact to determine if Team Associates was the procuring cause of both the hydraulic and oxygen transducer contracts and, if so, for what time period, or whether other factors broke the continuity of activity necessary to prove procuring cause.

Miscellaneous

Team Associates also contests Druck's split of its commissions with other territories. For some orders, Druck gave one-third of the commissions to the point of engineering, to the point of billing, and to the point of shipping. Team Associates argues that this was a unilateral reduction of its commission in contravention of the contract. However, the contract allowed Druck to spilt the commissions:

> In the event of an order being received as a result of representative effort being made in more than one territory commission will be split between the appropriate representative companies. The level of this split commission will be determined by Druck Inc. at the time of order placement.

Under this provision, Druck was within its rights to split the commission. Team Associates also disputes Druck's ac-

---

[14]*Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1282 (6th Cir. 1990).

counting of the split commissions. This issue may be resolved on remand.

■ Team Associates claims that the trial court erred by not granting its motion to amend its complaint to allow it to allege negligent misrepresentation. Team Associates' theory is essentially that Druck's president induced Team Associates to sign the agreement by offering a higher commission rate when he was really contemplating a lower commission rate. However, the president acted within the terms of the agreement when he tried to negotiate a lower commission rate. The representation agreement provided that for customized products Druck "reserve[d] the right to negotiate commission on a per account basis" if "special pricing [was] required for competitive reasons." Because a trial court appropriately denies a motion to amend when a claim is without merit,[15] as is the case here, the trial court did not err in precluding the addition of this claim.

■ Team Associates also claims that the trial court erred in dismissing its unjust enrichment claim and that it erred in refusing to allow Team Associates to amend its complaint to add additional equity claims. The trial court did not err. Although the procuring cause doctrine provides relief at law, it is essentially an equitable doctrine. Through the doctrine of procuring cause, Team Associates already has the opportunity to argue the equitable issues. Logically, if Team Associates cannot establish entitlement to relief under the procuring cause doctrine, Team Associates may not prevail under analogous equitable theories such as unjust enrichment.

## CONCLUSION

The trial court erred in dismissing on summary judgment Team Associates' procuring cause claims and Team Associates' request for an accounting of commission payments. The trial court did not err in granting Druck's mo-

---

[15]*See Orwick v. Fox*, 65 Wn. App. 71, 89, 828 P.2d 12, *review denied*, 120 Wn.2d 1014 (1992).

tion for summary judgment on the contract and it did not err in dismissing Team Associates' motion for summary judgment on its claim of unjust enrichment and its motion to amend. We remand for further proceedings consistent with our opinion.

BAKER, C.J., and ELLINGTON, J., concur.

Reconsideration denied April 16, 1998.

Review denied at 136 Wn.2d 1024 (1998).