

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MR. 99 & ASSOCIATES, INC.;
MARTIN S. ROOD,

        Respondents,

        v.

8011, LLC, a Washington limited
liability company; WALTER MOSS
and JANE DOE MOSS, husband and
wife, and their marital community;
KARI GRAVES and JOHN DOE
GRAVES, husband and wife, and their
marital community; FIRST AMERICAN
TITLE COMPANY,

        Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 73737-6-I

UNPUBLISHED OPINION

FILED: December 27, 2016

DWYER, J. — 8011 LLC appeals from the judgment entered against it in contract and tort actions brought by Martin Rood based upon 8011's refusal to pay Rood a commission on the sale of 8011's property. 8011 asserts that Rood is not entitled to a commission payment because he failed to procure a buyer under the conditions set forth in their brokerage agreement, including those conditions entitling Rood to a commission payment if a sale occurred within six months after the agreement's expiration. 8011 further asserts that Rood is not entitled to a commission payment because the final sale agreement between the

parties to the sale transaction did not provide for payment of a commission to Rood.

We conclude that Rood did not satisfy the pertinent conditions in the brokerage agreement so as to qualify for a commission payment, that the specificity of the language in the agreement's tail provision precludes resort to the procuring cause rule, and that the final sale agreement did not provide for a commission payment to Rood. We also conclude that, under the circumstances herein, Rood has not established that he was deprived of something of value that he possessed or of something in which he had a property interest. Thus, Rood is not entitled to a commission payment based on his tort or equitable theories of liability. Accordingly, we reverse the judgment of the trial court.

I

8011 LLC[1] entered into a brokerage contract with Martin Rood[2] to lease or sell commercial property on Highway 99 in Everett. The duration of the brokerage agreement was for six months, from July 21, 2011 to January 21, 2012. The agreement contained provisions entitling Rood to a 5 percent commission payment if he brokered a sale either during the duration of the agreement or, subject to certain conditions, within six months of the agreement's expiration (the tail provision).

Prior to contracting with 8011 as a sale-side brokerage agent, Rood was retained by Mazda of Everett (Mazda) as a buyer-side brokerage agent. As

---

[1] For ease of reference, we refer to the appellants in this case as 8011.
[2] For ease of reference, we refer to the respondents in this case as Rood, the principal agent for Mr. 99 & Associates.

such, he sought to purchase real estate on Mazda's behalf. While working with Mazda but prior to his brokerage agreement with 8011, Rood discussed with Mazda the notion of acquiring 8011's property. Mazda declined to pursue purchase of 8011's property at that time due to a statutory restriction precluding Mazda from purchasing the property, absent a waiver of the restriction.[3] Thereafter, during the term of Rood's brokerage agreement with 8011, Rood took no further action with regard to Mazda as a prospective purchaser of 8011's property.

On January 21, 2012, pursuant to its duration provision, the brokerage agreement between 8011 and Rood expired. The property remained unsold. During the six-month time period of the agreement, Rood did not procure a buyer for the property. Neither did he satisfy the requisite conditions affording him a commission payment if the property was sold within six months of the expiration of the agreement. Moreover, although repeatedly sought by Rood, he and 8011 did not agree to extend the length of the brokerage agreement or enter into a new contractual relationship either prior to the agreement's expiration or thereafter.

Three months after the brokerage agreement expired, Rood contacted 8011, inquiring as to whether it would be interested in selling the property to Mazda.[4] 8011 indicated that it would consider an offer to purchase.

---

[3] 8011's property was located 7.5 miles away from an existing Mazda dealership and, pursuant to RCW 46.96.140, Mazda was precluded from establishing a new Mazda dealership within 8 miles of an existing Mazda dealership, unless it obtained a determination of good cause from an administrative law judge or qualified for an exception to the restriction. RCW 46.96.160, .180.

[4] Mazda indicated that it had obtained a waiver of the statutory restriction.

Beginning in May and over the following four months, a series of proposed "Purchase & Sale Agreements" (PSAs) between 8011 and Mazda were exchanged, with the parties negotiating the price per square foot for the property and, later, negotiating a commission payment for Rood.

Mazda's initial offer, drafted by Rood, described Rood's firm both as the selling firm and as the listing firm. The offer also included a provision detailing a 5 percent commission payment to the selling firm to result from the sale of the property, with or without a written listing or commission agreement in place.

The offer was not accepted. Instead, negotiations continued. From June until mid-July, 8011 and Mazda each signed and submitted two counteroffers with the same commission payment terms as above, but offering varying prices per square foot. The negotiations stalled, however, when, upon receipt of Mazda's second counteroffer (its third offer overall), 8011, which by now had seen two of its own counteroffers rejected, did not respond.

On July 31, 2012, Mazda, through Rood, signed and submitted a new PSA to 8011 with a higher price per square foot. The new offer (Mazda's fourth overall) provided the same commission provisions for Rood. Again, 8011 did not respond.

In late August, Rood prepared two additional PSAs, one of which provided for him to receive a reduced commission payment and the other of which contained the same commission terms as in previous offers. Neither Mazda nor 8011 agreed to sign either of the documents. A few days later, a brokerage agent hired by 8011 drafted two counteroffers, both of which provided for a

-4-

smaller (2.5 percent) commission payment to Rood, identified Rood as the selling firm, and left blank the listing firm provision. Again, neither 8011 nor Mazda signed either of the documents.

In mid-September, Mazda drafted and signed two PSAs, both of which provided for a 2.5 percent commission payment to Rood, identifying him as the selling firm and no one as the listing firm. Neither offer was accepted. Two weeks later, 8011 notified Mazda that it would no longer consider selling the property to Mazda and discontinued negotiations.

Nevertheless, on October 8, 2012, Mazda submitted an offer to 8011 with different commission terms (the final PSA). The offer identified Rood as the "selling firm," but the commission provision was crossed out and, later in the agreement, a handwritten provision, added by Mazda, stated that, "seller will pay no real estate commissions at closing. Buyer does not warrant as to seller's liability for commission."

By October 12, Mazda and 8011 had signed the PSA, closing the sale a few months later. No commission was paid to Rood.

Rood commenced this action against 8011, alleging various theories of contract and tort liability, charging that 8011 had unlawfully deprived him of his commission payment for his role as the selling agent for 8011's property. 8011 counterclaimed, asserting violations of the Consumer Protection Act (CPA) arising from Rood's conduct as a dual agent. Eventually, Rood moved for summary judgment dismissal of the CPA claim, which the trial court granted, and

partial summary judgment in his favor on the commission claim, which the trial court denied.

Later, before a different judge, Rood and 8011 submitted cross motions for summary judgment. On May 27, 2015, the court denied both. With trial set for June 23, 2015, 8011 moved for reconsideration of the denial of its motion.

While 8011's motion was pending and with trial set to begin in less than two weeks, the trial court offered the parties the cost- and time-saving opportunity to strike the trial and have the judge decide the case as a matter of law. The parties accepted the trial court's offer.

The trial court granted judgment in favor of Rood, denying 8011's motion for reconsideration and awarding Rood $107,000—based upon the 5 percent commission provision in the expired brokerage agreement—plus reasonable attorney fees, costs, and prejudgment interest. The total judgment amount was $334,757.67.

8011 now appeals.

II

This case comes to us with an odd trial court procedural history. This oddity has engendered squabbling between the parties in their appellate briefing. Before we can turn to the merits of this appeal, we must resolve several preliminary questions:

1. By what procedure did the trial court decide this case? Was this procedure authorized by statute or court rule?

2. What is the proper content of the record before us on review?

3. What is our proper standard of review?

A

To recap the situation: (1) both plaintiffs and defendants moved for summary judgment on the merits, (2) each motion was denied, and (3) defendants (8011) moved for reconsideration.

With the parties 13 days from the start of an expensive and time-consuming trial, the judge's law clerk contacted them with an offer: "Judge Wilson has decided that the case is ripe for a decision on your summary judgment motions. . . . [H]e WILL provide a decision to resolve the case if parties are willing to strike the trial." However, the law clerk informed counsel, Judge Wilson did not believe that he could find the time to rule prior to their scheduled trial date.

In response, "Plaintiffs agree[d] . . . [that] Judge Wilson may decide this action as a matter of law." Eventually, a satisfactory alternative to trial was mutually agreed upon.

> [A]ll parties agree that Judge Wilson may decide this action in its entirety based on the summary judgment pleadings, defendants' motion for reconsideration, plaintiffs' pleadings in opposition to defendants' motion for reconsideration, and defendants' reply pleadings in support of reconsideration. As a result, we agree to strike the June 23, 2015 trial date.

After this memorialization of the agreement, the law clerk further informed counsel, "if parties want to submit proposed findings of fact and conclusions of law, he will consider those as well."

However, upon ruling on the case, the only findings of fact entered were those related to the attorney fee award, not to the merits of the dispute. As to his

ruling on the merits, Judge Wilson referred to that ruling as one granting plaintiffs' cross motion for summary judgment.

The manner in which the case was decided was unusual. But it was lawful. When a superior court has subject matter jurisdiction over a dispute

> all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the laws.

RCW 2.28.150.

Here, both parties' motions for summary judgment had been denied. Only the defendants sought reconsideration. But the court's final decision was, on the merits, in favor of the plaintiffs.

Plainly, this was not a straightforward CR 56 decision. Neither was it solely a ruling on the defendants' CR 59 motion for reconsideration.

Instead, the judge offered the parties a substitute for trial—a ruling as a matter of law on the merits based on the pleadings and evidence that had been submitted to him. The parties agreed to this process. Thus, the trial judge decided the case by means of a trial by affidavits without fact-finding. This was authorized by statute. RCW 2.28.150.

B

Our next task is to determine the content of the record before us. Specifically, the parties dispute whether Judge Wilson (and therefore the appellate court) was authorized to consider the declaration of Kari Graves.

Graves is a party to this case and her declaration was in the court file, having been submitted in support of an earlier motion seeking virtually the same relief. Normally, where, as here, a judge offers a substitute for trial, suggesting that the case can be decided on the pleadings already submitted, we would assume that a party's declaration would be considered. After all, the party is giving up the right to a trial at which the party would be allowed to testify to the same facts as those set forth in the declaration.

It is also true, however, that—as to the second round of summary judgment motions—Graves' declaration was not resubmitted to the trial court. Rood argues that the parties' agreement regarding the documents to be considered included only the last round of motions, pleadings, and supporting documents. Because we can decide the merits of this appeal without resort to Graves' declaration, we choose to do so, eliminating the need for us to divine the parties' intentions regarding the declaration at issue.

C

Our final preliminary task is to identify the proper standard of review. Because the trial judge decided the case without engaging in fact-finding, we will apply the summary judgment standard of review.[5]

> We engage in a de novo review of a ruling granting summary judgment. Anderson v. Weslo, Inc., 79 Wn. App. 829, 833, 906 P.2d 336 (1995). Thus, we engage in the same inquiry as the trial court. Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d

---

[5] Rood's argument that we should apply an abuse of discretion standard because a motion for reconsideration was pending misses the point. The parties agreed to have the trial judge decide the _entire case_, not just the motion for reconsideration. Indeed, had the judge decided only the motion for reconsideration, Rood could not have prevailed, as Rood did not seek reconsideration of the ruling denying his summary judgment motion. The CR 56 standard of review is clearly appropriate.

692, 698, 952 P.2d 590 (1998). Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. CR 56(c); Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). All reasonable inferences from the evidence must be construed in favor of the nonmoving party. Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979).

Green v. Normandy Park Riviera Section Cmty. Club, Inc., 137 Wn. App. 665, 681, 151 P.3d 1038 (2007).

III

8011 asserts that Rood is not entitled to a brokerage commission payment pursuant to the law of contracts because neither the terms of the brokerage agreement, the procuring cause rule, nor the terms of the final PSA provided for a commission payment to Rood. We agree.

A

8011 first asserts that, because Rood failed to procure a buyer as required by the conditions of the brokerage agreement, Rood is not entitled to a commission payment pursuant to that agreement. 8011 is correct.

"The touchstone of contract interpretation is the parties' intent." Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). We may determine the parties' intent

not only from the actual language of the agreement but also from "viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties."

Tanner Elec., 128 Wn.2d at 674 (internal quotation marks omitted) (quoting Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc., 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993)).

"Courts should not find an ambiguity in order to construe the contract, and an ambiguity will not be read into a contract where it can reasonably be avoided by reading the contract as a whole." Grant County Constructors v. E.V. Lane Corp., 77 Wn.2d 110, 121, 459 P.2d 947 (1969). "A court cannot, based upon general considerations of abstract justice, make a contract for parties which they did not make for themselves." Wagner v. Wagner, 95 Wn.2d 94, 104, 621 P.2d 1279 (1980).

The brokerage agreement herein constituted an "exclusive lease listing agreement" between 8011 and Rood. Section 3 of the agreement defined "lease," in pertinent part, as "sell" or "enter into a contract to . . . sell."

Section 1 of the agreement was a duration provision, which read: "DURATION OF AGREEMENT. This Agreement shall commence on July 21, 2011 and shall expire at 11:59 p.m. on January 21, 2012."

Two sections in the agreement discussed Rood's commission in the event of a lease or sale. Section 6 stated that, in the event that the property was sold or leased, Rood would receive a commission payment as long as one of the five conditions set forth therein was met. Two of these conditions are pertinent here, entitling Rood to a commission payment when

> (a) [Rood] leases or procures a lessee on the terms of the Agreement, or on other terms acceptable to the Owner; . . . (c) [8011] leases the Property within six months after the expiration or sooner termination of this Agreement to a person or entity that

submitted an offer to purchase or lease the Property during the term of this Agreement or that appears on any registration list[6] provided by [Rood] pursuant to this Agreement.[7]

Section 9 of the agreement, entitled "Additional Terms," read, in pertinent part: "If [Rood] sells this property for [8011], then [Rood] will be entitled to a commission of 5% of the gross selling price."

Construing the brokerage agreement as a whole, if 8011 sold the property, Rood would be entitled to receive a commission payment in either of three scenarios: (1) pursuant to sections 6(a) and 9, if Rood procured a buyer for the property during the agreement's specified duration; (2) pursuant to sections 6(c) and 9, if 8011 accepted an offer to sell the property to a buyer within six months after the agreement's expiration, conditioned on Rood having brought that buyer's offer to 8011 during the agreement's specified duration; or (3) also pursuant to sections 6(c) and 9, if 8011 sold the property within six months after the agreement's expiration to a buyer listed on a "registration list" of potential buyers, conditioned on Rood having provided such a "registration list" to 8011 during or shortly after the expiration of the agreement's durational period.

Rood did not procure a buyer for the property in the time period specified by the agreement's duration provision. Rood did not satisfy the conditions specified in the agreement's tail provision, failing to provide 8011 an offer to

---

[6] Section 6 of the agreement permitted Rood to provide 8011 with a registration list within 15 days "after the expiration or sooner termination of [the] Agreement." Section 6 further described the "registration list" as comprising "persons or entities to whose attention the Property was brought through the signs, advertising or other action of [Rood], or who received information secured directly or indirectly from or though [Rood] during the term of this Agreement."

[7] The remaining conditions were as follows: "(b) [8011] leases the Property directly or indirectly or through any person or entity other than [Rood] during the term of this Agreement; . . . (d) the Property is made unleasable by [8011]'s voluntary act; or (e) [8011] cancels this Agreement, or otherwise prevents [Rood] from leasing the Property."

purchase from Mazda during the duration of the agreement and failing to provide a registration list to 8011 during or shortly after the expiration of the agreement's durational period.

Thus, the brokerage agreement expired without Rood having satisfied the terms that would entitle him to receive a commission payment. Accordingly, Rood is not entitled to a commission under the terms of the brokerage agreement.[8]

B

8011 next asserts that Rood is not entitled to receive a commission payment pursuant to the procuring cause rule. 8011 is correct.

"The procuring cause rule states that when a party is employed to procure a purchaser and does procure a purchaser to whom a sale is eventually made, he is entitled to a commission regardless of who makes the sale if he was the procuring cause of the sale." Willis v. Champlain Cable Corp., 109 Wn.2d 747, 754, 748 P.2d 621 (1988). "This rule is applied to allow agents commissions on sales completed after a principal has terminated their employment if the sales resulted from the agent[s'] efforts." Willis, 109 Wn.2d at 754.

---

[8] Rood asserts that he is entitled to a commission payment under the brokerage agreement for the sale of the property because, unlike the other provisions entitling him to a commission, two of the agreement's provisions pertaining to sales—section 6(a) and section 9—do not have an expiration date. This, he claims, implies that pursuant to those provisions he was entitled to a commission payment regardless of when the sale ultimately took place. Rood is wrong.

A plain reading of the entire agreement reveals that the duration provision in section 1 is incorporated into the subsections cited by Rood. The duration provision states, "This Agreement shall commence" on one date and "shall expire" on another. Nothing in the duration provision indicates an intent to limit the scope of the provision to particular sections of the agreement. Indeed, the broad language of the duration provision makes it clear that the parties intended the provision to control the entire agreement.

Importantly, however, the procuring cause rule does not apply when "a written contract expressly provides 'how commissions will be awarded when an employee or agent is terminated.'" Syputa v. Druck, Inc., 90 Wn. App. 638, 645, 954 P.2d 279 (1998) (quoting Willis, 109 Wn.2d at 755). "In the absence of a contractual provision specifying otherwise, the procuring cause doctrine acts as a gap filler." Syputa, 90 Wn. App. at 645-46 (citing Indus. Representatives, Inc. v. CP Clare Corp., 74 F.3d 128 (7th Cir. 1996)). Washington courts are "reluctant" to apply "the procuring cause rule to cases involving a clearly written employment contract." Willis, 109 Wn.2d at 756.

Herein, the brokerage agreement included a tail provision governing Rood's entitlement to a commission should a sale occur after the agreement's expiration. The brokerage agreement, including its tail provision, "was a contract negotiated at arm's length . . . by sophisticated parties." State v. Farmers Union Grain Co., 80 Wn. App. 287, 293, 908 P.2d 386 (1996). As a result of their negotiations, the parties agreed to a tail provision setting forth two conditions that would entitle Rood to a commission payment. Rood satisfied neither.

Because the parties negotiated for a tail provision detailing the circumstances under which Rood would be entitled to a commission payment after the agreement's expiration, there is no gap to be filled. Accordingly, Rood is not entitled to receive a commission payment based on the claim that he was the procuring cause of the eventual sale of 8011's property.[9]

---

[9] Rood relies on Ctr. Invs., Inc. v. Penhallurick, 22 Wn. App. 846, 592 P.2d 685 (1979), to support his assertion that he was the procuring cause of the property's sale. However, the court in Penhallurick applied the procuring cause rule to the transaction therein because the broker had an oral brokerage agreement, presumptively one in which no tail provision was included (given

C

8011 additionally asserts that the final PSA between 8011 and Mazda does not entitle Rood to a commission as a third-party beneficiary. We agree.

Again, the touchstone of contract interpretation is the parties' intent. Tanner Elec., 128 Wn.2d at 674 (citing Scott Galvanizing, 120 Wn.2d at 580-81). Where written words in a contract "are inconsistent with or contradict part of a printed form, the written words will be presumed to disclose the true intent of the parties." Davis v. Lee, 52 Wash. 330, 340, 100 P. 752 (1909).

> [W]here there is no ambiguity, all conversations, contemporaneous negotiations, and parol agreements between the parties prior to a written agreement are merged therein. In the absence of accident, fraud, or mistake, parol evidence is not admissible for the purpose of contradicting, subtracting from, adding to, or varying the terms of such written instruments.

Fleetham v. Schneekloth, 52 Wn.2d 176, 178-79, 324 P.2d 429 (1958).

"The creation of a third-party beneficiary contract requires that the parties intend that the promisor assume a direct obligation to a third party at the outset of the contract." Lewis v. Boehm, 89 Wn. App. 103, 106, 947 P.2d 1265 (1997) (citing Burke & Thomas, Inc. v. Int'l Org. of Masters, Mates & Pilots, 92 Wn.2d 762, 767, 600 P.2d 1282 (1979)). "To determine if a third-party beneficiary exists the court should consider the terms of contract and determine if performance of the contract necessarily and directly benefits a third party." Lewis, 89 Wn. App.

---

that the opinion does not mention such a provision), 22 Wn. App. at 850, and because the written agreement between the buyer and seller specifically provided for a payment of a commission to the broker. 22 Wn. App. at 848. Because this matter does not involve an oral brokerage agreement, the parties specifically contracted for a tail provision in their brokerage agreement, and the final written contract between the buyer and seller did not provide for payment of a commission, Penhallurick is inapplicable.

at 106 (citing Del Guzzi Constr. Co. v. Global Nw., Ltd., 105 Wn.2d 878, 886-87, 719 P.2d 120 (1986)).

The final PSA did not provide a commission for Rood. The commission provision in the PSA was crossed out and the handwritten word "DELETED" appears. On the following page, sections regarding listing firms and brokers were crossed out and the word "NONE" is set forth in both sections. Moreover, later in the agreement, it is stated, also in handwriting, that "seller will pay no real estate commissions at closing. Buyer does not warrant as to seller's liability for commission."

The final PSA between 8011 and Mazda clearly demonstrates that the parties did not intend to pay Rood a commission. Although the PSA does indicate that Rood is the "selling firm," any inference in favor of Rood as a third-party beneficiary to the contract is negated by the other explicit language in the contract—particularly, 8011 and Mazda crossing out the commission section in the agreement and further stating that "seller will pay no real estate commissions at closing." Thus, because Rood did not "necessarily and directly benefit[ ]" from performance of the contract, Lewis, 89 Wn. App. at 106, Rood cannot be said to be a third-party beneficiary of the final PSA between 8011 and Mazda.

Nonetheless, Rood relies on the prior offers and counteroffers between 8011 and Mazda in an attempt to contradict the final PSA's excised commission provisions. His reliance on this parol evidence is unavailing.

Any of the prior negotiations and conversations between Rood, 8011, and Mazda are considered merged into the final agreement. Because the terms in

the prior offers and counteroffers contradict the terms in the final PSA, they constitute parol evidence that cannot be used to determine the parties' intent concerning the final PSA. Fleetham, 52 Wn.2d at 179. Thus, there is no indication within the final PSA that 8011 and Mazda intended to pay Rood a commission. We will not construe the final agreement at variance with its plain language.[10]

D

8011 also claims that Rood cannot prevail because he cannot point to a brokerage agreement, providing him a commission payment, that complies with the statute of frauds. We agree.

A brokerage agreement to sell real property for a commission must satisfy the statute of frauds.

> In the following cases, specified in this section, any agreement, contract, and promise shall be void, unless such agreement, contract, or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him or her lawfully authorized, that is to say: . . . (5) an agreement authorizing or employing an agent or broker to sell or purchase real estate for compensation or a commission.

RCW 19.36.010. The "statute of frauds requires that all real estate brokerage agreements be in writing and signed by the party to be bound." Bishop v. Hansen, 105 Wn. App. 116, 120, 19 P.3d 448 (2001). Indeed, the statute governing a broker's compensation for the sale of real property confirms the

---

[10] Rood relies on Bonanza Real Estate, Inc. v. Crouch, 10 Wn. App. 380, 385, 517 P.2d 1371 (1974), for the proposition that "[t]he terms of the sale as ultimately consummated are immaterial if the broker was the procuring cause of the sale itself." His reliance on Bonanza is unavailing. There, the broker satisfied the tail provision of the brokerage agreement. Bonanza, 10 Wn. App. at 382-83. Here, Rood did not.

applicability of the statute of frauds. "Nothing contained in this chapter negates the requirement that an agreement authorizing or employing a broker to sell or purchase real estate for compensation or a commission be in writing and signed by the seller or buyer." RCW 18.86.080(7).

> The fraud sought to be prevented by RCW 19.36.010(5) "relates to disputes as to the amount of commission or compensation, the term of the listing agreement, if exclusive or nonexclusive, and most important, if any agreement existed at all." House v. Erwin, 83 Wn.2d 898, 904, 524 P.2d 911 (1974). Essential to any writing meeting the terms of the statute as it relates to real estate brokerage agreements is a description of "the parties, the employment, the description of the real estate and *the agreement to pay the commission* . . . ." Cushing v. Monarch Timber Co., 75 Wash. 678, 685, 135 P. 660 (1913) (emphasis added).

Bishop, 105 Wn. App. at 120.

> The memorandum or memoranda in writing, to satisfy the requirements of the statute, must not only be signed by the party to be charged but it must also be so complete in itself as to make recourse to parol evidence unnecessary to establish any material element of the undertaking. Liability cannot be imposed if it is necessary to look for elements of the agreement outside the writing. It follows that parol evidence is not admissible or permissible to establish an essential provision of the alleged agreement nor to supply deficiencies in the writing.

Smith v. Twohy, 70 Wn.2d 721, 725, 425 P.2d 12 (1967) (citations omitted).

Rood claims that the various writings exchanged between the buyer and seller during the course of their negotiations evince an intent to afford him a commission. As these offers and counteroffers were in writing, Rood asserts, there was compliance with the statute of frauds. We disagree.

The writings upon which Rood relies were either rejected by the other party or withdrawn without having been accepted. Because none of these offers

were accepted, they did not and could not create a binding legal agreement between Mazda and 8011. Cent. Puget Sound Reg'l Transit Auth. v. Heirs & Devisees of Eastey, 135 Wn. App. 446, 454, 144 P.3d 322 (2006) ("An offeree's power of acceptance is terminated 'when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 42 (1981))). The legally defunct counteroffers signed by 8011 cannot satisfy the statute of frauds. Thus, for this reason as well, Rood cannot establish an entitlement to a commission payment.

For each of the reasons set forth above, Rood fails to demonstrate that the law of contracts supports his quest for a commission payment.

IV

8011 further asserts that, because Rood is not entitled to a commission payment, he is not entitled to recover on either his equitable claim of unjust enrichment or his tort claims of trover, conversion, misappropriation, and tortious interference with a business expectancy. We agree.

Each of the theories of tort or equitable liability set forth by Rood presupposes that he was deprived of something of value that he possessed or of something in which he had a property interest. See, e.g., Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008) ("Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." (emphasis added)); Potter v. Wash. State Patrol, 165 Wn.2d 67, 78, 196 P.3d 691 (2008) (Trover "redress[es] an interference with one's interest in a chattel.'" (emphasis added) (quoting

- 19 -

Iglesias v. United States, 848 F.2d 362, 364 (2d Cir. 1988))); Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank, 80 Wn. App. 655, 675, 910 P.2d 1308 (1996) ("[T]o maintain a conversion action, the plaintiff need only establish '*some property interest* in the goods allegedly converted.'" (emphasis added) (quoting Michel v. Melgren, 70 Wn. App. 373, 376, 853 P.2d 940 (1993))); Ed Nowogroski Ins., Inc. v. Rucker, 88 Wn. App. 350, 356-57, 944 P.2d 1093 ("To establish a trade secret misappropriation claim, a plaintiff must first show that a *legally protected trade secret exists*." (emphasis added)), aff'd, 137 Wn.2d 427, 971 P.2d 936 (1999); Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc., 114 Wn. App. 151, 157, 52 P.3d 30 (2002) ("To prove tortious interference with a business expectancy, a plaintiff must show . . . *the existence of a valid contractual relationship or business expectancy*." (emphasis added)).

As the analysis herein demonstrates, Rood was neither deprived of something of value nor of something in which he had a property interest. Indeed, Rood never possessed anything of value. He failed to satisfy the conditions entitling him to a commission payment during and after the time period specified in the brokerage agreement. Further, although negotiations between 8011 and Mazda leading up to the sale may have, at one point, reflected an intention to benefit Rood, those negotiations were merged into the final agreement, which did not so provide, resulting in no contractual right being conferred to Rood.

Thus, Rood failed to establish the necessary premise for his theories of equitable or tort liability against 8011. Accordingly, we also reverse the decision of the trial court on Rood's tort and equitable claims.

V

Rood asserts that he is entitled to an award of attorney fees on appeal and that he remains entitled to the attorney fees he was awarded by the trial court. Because we conclude that 8011 prevails on appeal, Rood is not entitled to an award of appellate attorney fees. Further, because we reverse the trial court's judgment as a matter of law in favor of Rood, the attorney fee award granted upon that judgment must also be vacated. We remand to the trial court for entry of judgment as a matter of law in favor of 8011 and for such other ancillary proceedings as are necessary.

Reversed and remanded.

We concur: