# Supreme Court of Texas

No. 21-0036

Thomas Brandon Perthuis,

*Petitioner*,

v.

Baylor Miraca Genetics Laboratories, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued February 2, 2022**

JUSTICE YOUNG delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Devine, Justice Blacklock, Justice Busby, and Justice Bland joined.

JUSTICE HUDDLE filed a dissenting opinion, in which Justice Boyd joined.

When a seller agrees to pay sales commissions to a broker (or other agent), the parties are free to condition the obligation to pay commissions however they like. But if their contract says nothing more than that commissions will be paid for sales, Texas contract law applies a default rule called the "procuring-cause doctrine." Under that rule,

the broker is entitled to a commission when "a purchaser [was] produced through [the broker's] efforts, ready, able and willing to buy the property upon the contracted terms . . . ." *Goodwin v. Gunter*, 185 S.W. 295, 296 (Tex. 1916). In this case, the agreement between the parties was silent about any exceptions to the duty to pay commissions for sales that petitioner procured. The procuring-cause doctrine therefore applies. Because the court of appeals held otherwise, we reverse its judgment and remand for further proceedings.

**I**

Respondent Baylor Miraca Genetics Laboratories, LLC (BMGL) made petitioner Brandon Perthuis its Vice President of Sales and Marketing in early 2015. BMGL drafted the two-page employment agreement, which Perthuis signed without alteration. The agreement gave Perthuis an annual base salary of $145,000 and stated that Perthuis's employment would be "at-will." As to Perthuis's commissions, it provided: "Your commission will be 3.5% of your net sales." Nothing more—the employment agreement did not, for example, define "net sales" or place any other parameters on the commission obligation. The employment agreement also noted that Perthuis would be eligible for retention bonuses; it referenced a separate "retention agreement," which Perthuis also signed the same day. The retention agreement expressly conditioned any retention bonus on Perthuis's continued employment.

BMGL develops and analyzes genetic tests. BMGL sells its tests to "channel partners," who return test specimens to BMGL after obtaining orders from physicians. Perthuis served BMGL by pursuing and negotiating contracts with channel partners, the most prominent of

which was Natera, Inc. In 2015, Perthuis negotiated such a contract between Natera and BMGL. Natera agreed to purchase a minimum number of tests; in exchange, it received an exclusivity agreement, under which BMGL promised not to perform tests for Natera's direct competitors. Natera, moreover, would pay a penalty and forfeit that exclusivity if it failed to purchase the stated minimum. Perthuis's role with respect to the sales that flowed from the Natera agreement was then done; he did not, for example, solicit batches of particular test orders, send invoices, or collect payments. But he received commissions on all sales that arose under the Natera agreement. BMGL calculated those commissions by multiplying "net" sales (*i.e.*, gross sales to Natera under the contract, adjusted by a collection rate) by 3.5%.

Although the Natera agreement was drafted to last for five years, Natera completed its minimum-purchase requirement far more quickly. Natera was set to meet that requirement by the end of 2016, at which point Natera would have had no further obligation to continue buying any tests under the agreement (although Natera had the option to continue purchasing a certain number of tests each quarter to retain exclusivity until 2020). BMGL, unsurprisingly, preferred increasing its business with Natera to either losing that business or being forced to retain an exclusive relationship with only minimal ongoing sales.

BMGL therefore directed Perthuis to negotiate a contractual amendment. Perthuis spent months doing so and completed the negotiations in January 2017. The terms of the amended contract substantially increased Natera's minimum-purchase requirement, making it the largest such contract in BMGL's history.

3

Perthuis relayed his success to BMGL leadership on Thursday, January 19. The CEO immediately requested a meeting with Perthuis, which was set for the following Monday, January 23. The meeting, it turns out, was not to commend Perthuis, but to fire him. The very next day, January 24, BMGL executed the amendment that Perthuis had negotiated.[1]

BMGL refused to pay Perthuis commissions on any sales that were finalized after his termination, including sales that flowed from the amended Natera contract. Nor did BMGL pay anyone else commissions for those sales. In fact, earlier in January—before Perthuis announced his breakthrough with Natera—BMGL's leadership had sought to cut costs by altering its commission and compensation plans. BMGL rolled out a new commission plan for its junior sales team, which expressly stated that commission fees would only "be made to employee if employed at the end of the commission period." BMGL did not, however, change Perthuis's commission structure.

Perthuis claimed that he was the procuring cause of all sales to Natera and other channel partners that were finalized in the period from his termination through trial in October 2018.[2] He sued BMGL for breach of contract, asserting that he was entitled to a commission on all

---

[1] Just over two months after BMGL terminated Perthuis, BMGL and Natera executed another amendment, modifying the pricing terms. Six months later, BMGL and Natera again modified the pricing through a memorandum of understanding.

[2] The parties (and the Court) focus on the sales to Natera because those sales dwarfed those to other channel partners and commissions for them constitute the bulk of the jury's award.

4

those sales.[3] BMGL denied having any further commission-related obligations to Perthuis. It argued that the employment agreement's text clearly displaced any role for the procuring-cause doctrine. But even if the contract *were* silent and that doctrine *did* apply, BMGL argued that Perthuis could not meet his burden to show that he qualified as a "procuring cause" of any sales for which he claims unpaid commissions.

The case went to trial, and the court instructed the jury on the procuring-cause doctrine as follows:

> Perthuis' "sales" included all sales for which he was the procuring cause.
>
> A "procuring cause" of a sale is the principal and immediate cause of the sale. It need not be the sole cause, and an agent is said to be the procuring cause of a sale when his acts have so contributed to bringing about the sale that but for his acts the sale would not have been accomplished.
>
> The fact that Mr. Perthuis was discharged by BMGL prior to the time a sale was completed does not bar his right to a commission if he was the procuring cause of the sale.

The jury found for Perthuis as to Natera and other channel partners but did not award him the full amounts that he sought. The trial court rendered judgment on the verdict but declined to award any attorneys' fees to Perthuis.[4]

BMGL appealed; Perthuis cross-appealed to challenge the denial of attorneys' fees. The court of appeals reversed and rendered judgment

---

[3] Perthuis also brought other claims, but only his breach-of-contract claim was tried to a jury, and only that claim is before us.

[4] The judgment awarded Perthuis $962,336.89 in compensatory damages for unpaid commissions, $80,282.63 in prejudgment interest, and postjudgment interest at 5%.

5

for BMGL. According to that court, the parties' contract unambiguously entitled Perthuis to commissions only for sales made during his employment, not for procuring potential buyers for sales that closed after he was terminated. The court of appeals thus declined to address BMGL's further challenges to the trial court's judgment. The court upheld the denial of attorneys' fees for Perthuis because Perthuis no longer was the prevailing party.

## II

This Court most clearly articulated the procuring-cause doctrine in *Goodwin v. Gunter* over a century ago, describing it as a "settled and plain" rule. 185 S.W. at 296. The doctrine provides nothing more than a default, which applies only when a valid agreement to pay a commission does not address questions like how a commission is realized or whether the right to a commission extends to sales closed after the brokerage relationship ends.

When a plaintiff seeks to recover commissions under the procuring-cause doctrine, as in this case, three main questions arise. First, did the parties have the kind of contractual relationship to which the procuring-cause doctrine applies? If so, did the parties displace the doctrine by the terms of their contractual agreement? Finally, if the procuring-cause doctrine applies to the parties' dispute and was not displaced, to what extent does the doctrine impose liability for the specific commission payments that the plaintiff demands? We address these questions in turn.

### A

If a plaintiff seeks to invoke the procuring-cause doctrine, the initial question is whether the doctrine even applies to the contractual

relationship between the parties. *Goodwin* and other cases make clear that the minimum prerequisite for the doctrine to apply is an agreement to pay a commission on a sale. *Id.* The quintessential example of such a contractual relationship is a broker seeking to procure a buyer for real property, as in *Goodwin* itself. Yet in cases far beyond the real-estate industry, Texas courts,[5] and those of many other jurisdictions,[6] have employed and continue to employ the procuring-cause doctrine.[7]

The function of the procuring-cause doctrine is to credit a broker (or salesman, or other agent) for a commission-generating sale when "a

---

[5] Texas lower-court cases have applied the procuring-cause doctrine to contracts involving metal buildings, marine equipment, mules, and rose bushes, to offer but a few non-real-estate examples. *See, e.g.*, *Murphy v. McDermott Inc.*, 807 S.W.2d 606, 607, 612 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (marine equipment); *Metal Structures Corp. v. Bigham*, 347 S.W.2d 270, 273 (Tex. Civ. App.—Dallas 1961, writ ref'd n.r.e.) (metal buildings); *Ray v. Robinson*, 271 S.W.2d 159, 163 (Tex. Civ. App.—Texarkana 1954, no writ) (rose bushes); *Gibbens v. Williams*, 4 S.W.2d 316, 317 (Tex. Civ. App.—Austin 1928, no writ) (mules).

[6] To take two examples, *Zelensky v. Viking Equipment Co.*, 422 P.2d 293, 296–97 (Wash. 1966), applied the procuring-cause doctrine to an electronic-device sale and *Gunderson v. North American Life & Casualty Co.*, 78 N.W.2d 328, 331–33 (Minn. 1956), applied the doctrine to the sale of life insurance. *See also, e.g.*, *Cisne v. Gen. Elec. Cap. Corp.*, 26 F. App'x 229, 232–33 (4th Cir. 2002) (sale of vehicle-service program to car dealers); *Mastaba, Inc. v. Lamb Weston Sales, Inc.*, 23 F. Supp. 3d 1283, 1298–99 (E.D. Wash. 2014) (frozen potato products).

[7] The doctrine remains in active use in Texas courts. *See, e.g.*, *Logan v. Randall*, No. 05-19-00043-CV, 2020 WL 948381, at *5 (Tex. App.—Dallas Feb. 27, 2020, pet. denied) (confirming and applying the doctrine's "general rule" in real-estate context); *Cohen-Sagi v. ProFinance Assocs., Inc.*, No. 04-08-00181-CV, 2009 WL 540217, at *2 (Tex. App.—San Antonio Mar. 4, 2009, pet. denied) (describing litigation involving the doctrine in the context of selling businesses). This Court has not needed to address the procuring-cause doctrine since 1952. *Air Conditioning, Inc. v. Harrison-Wilson-Pearson*, 253 S.W.2d 422 (Tex. 1952).

purchaser [was] produced through [the broker's] efforts, ready, able and willing to buy the property upon the contract terms . . . ." *Goodwin*, 185 S.W. at 296. Under this doctrine, the broker's entitlement to a commission vests on his having *procured* the sale, not on his actual involvement in a sale's execution or continued employment through the final consummation of the sale. *Goodwin*'s analysis rested on the idea that—absent contractual language to the contrary—the contract deems a sale to be the broker's sale if the broker, while under contract with the owner, made the sale possible. The Court's essential holding was that "the commissions are earned and the broker is entitled to their payment according to the contract if, while it is in force, he procures a purchaser to whom the owner directly makes a sale upon terms which are satisfactory to himself . . . ." *Id.*

"This is but a rule of fairness and right," the Court continued. *Id.* After all, when a broker fully complies with *his* obligations, "the owner receives the full benefit of the broker's effort. Through the diligence of the broker a buyer is produced." *Id.* Once a broker performs the task of "[h]aving interested a prospective buyer," an owner cannot deny the broker "a fair opportunity of making a sale to him upon the terms authorized." *Id.* Of course, an owner may always "take the matter into his own hands, avail himself of the broker's effort, [and] close a sale upon satisfactory terms," but if he does, the owner's right to "deny the broker's right of compensation, is a proposition not to be countenanced." *Id.*

We specifically rejected the argument, heavily pressed by BMGL, that eliminating a broker's role immediately before finalizing a sale means that the broker could not have taken the necessary final step to earn a commission:

8

It is no answer in such a case to say that a purchaser has not been produced by the broker . . . and the owner is therefore free to deal with the buyer, though produced by the broker, without any liability to the latter. That becomes unimportant in the face of the outstanding fact that it is by the broker the buyer is produced, and, before his negotiation is concluded, a sale is made, as the result of his effort . . . . The owner will therefore be deemed, in such a case, to have waived the terms to which the broker was confined, and the law declares him liable for the commissions fixed by the contract, for the reason that, except as to such waived provision, the broker's part of the contract has been fully performed. . . .

*Id.* at 296–97; *see also Keener v. Cleveland*, 250 S.W. 151, 152 (Tex. Comm'n App. 1923, judgm't affirmed) (confirming that a broker is entitled to a contractual commission if he was the procuring cause of the sale even if the sale was concluded by the seller or another broker).

The procuring-cause doctrine is not a judicially created "term" for commission contracts. It does not add anything to a contract or take anything away. It does not restrict parties' ability to modify their contractual relationships and it does not change the law governing whether parties have entered into such a relationship in the first place. Parties certainly may condition the obligation to pay a commission on something other than procuring the sale—they need only say so. The doctrine provides nothing more than a default rule to enforce parties' existing agreements as set forth in their contract. Functionally, it precludes *post hoc* efforts to rewrite contracts by adding exceptions under the guise of ambiguity.

When an agreement's "language can be given a certain or definite legal meaning or interpretation," courts determine that meaning "as a

9

matter of law." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). Only if ambiguity remains "*after* applying the pertinent rules of construction" could there be a fact question about intent. *Id.* (emphasis added; internal quotation omitted). For contracts involving commissions, all the usual "rules of construction" apply, like the familiar presumptions favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms. *See, e.g.*, *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017) (discussing several of the "well-established rules of contract construction"). The procuring-cause doctrine plays the same analytical role: allowing courts to ascertain and honor the parties' intent as expressed in their text. Judicial interpretations of contracts are "governed by what [the parties] said in [their] contract, not by what one side or the other alleges they intended to say but did not." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010).

Thus, by analogy, parties may freely define an ordinary word to have an unusual meaning; when they do, they rebut the presumption of ordinary usage.[8] Without any textually expressed bespoke meaning, however, courts will adopt the ordinary usage as a matter of law. *See, e.g.*, *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018).[9]

---

[8] *See, e.g.*, *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 64 (Tex. 2014) ("We cannot interpret a contract to ignore clearly defined terms . . . .").

[9] The dissent contends that the parties should have been allowed to introduce extrinsic evidence to give meaning to the parties' written agreement. *Post* at 2–3, 12. In *URI*, however, the Court rejected the use of extrinsic evidence to "interpolate constraints not found in the contract's unambiguous language." 534 S.W.3d at 758, 769. As *URI* makes clear, extrinsic evidence only "elucidates

10

Likewise, parties may freely provide their own rules for paying or withholding commissions. If they do, the procuring-cause doctrine becomes irrelevant. But without such additional terms, courts will not indulge a party's effort to smuggle in limitations on commission payments that parties could have, but did not, textually express.

The procuring-cause doctrine, therefore, is just a manifestation of our larger refusal to countenance any effort by parties to override the authoritative constructions of contracts. Stability and predictability of contract law, and maintaining parties' incentives to write with clarity, require holding parties to the text as written—and require courts to read text as consistently as possible from case to case. The procuring-cause doctrine contributes to that stability by providing a default rule to understand what it means to promise to pay commissions for procuring a sale. We reiterate, however, that the doctrine imposes no substantive limits. Parties remain free to structure commission agreements as they choose.

To be clear—and as discussed in greater detail in Part II.C—the doctrine fully respects the factfinder's authority and obligation to determine *whether* the broker's action produced the purchaser, which generally is "purely a question of fact." *Goodwin*, 185 S.W. at 297.

_____

the meaning of the words employed" and cannot prove that "the parties intended additional requirements or constraints that were not expressed in the agreement—such as delivery by 5:00 p.m. or only on Sundays." *Id.* at 765–66. The same reasoning applies in this case, where the use of extrinsic evidence would be to prove a limitation on the commission obligation (specifically, continued employment) that the agreement does not include. Equally important, we reiterated that extrinsic evidence may not be used to "create ambiguity." *Id.* at 757 (quoting *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 688 (Tex. 2017)).

11

Under this framework, at least since *Goodwin*, Texas courts have applied the doctrine's rule when it arises.[10]

Because the employment contract here promises commissions for sales, BMGL and Perthuis's contractual relationship is the kind to which the procuring-cause doctrine applies.[11]  We thus proceed to the second question: Did the parties take any steps to displace the doctrine?

## B

We must ask the question because the procuring-cause doctrine is merely a default rule.  "As always, parties dissatisfied with the common-law rule we [reaffirm] today remain free to provide, by contract, for additional or different rules . . . ."  *Monroe Guar. Ins. Co. v. BITCO*

---

[10] *See, e.g.*, *Frady v. May*, 23 S.W.3d 558, 563 (Tex. App.—Fort Worth 2000, pet. denied) (collecting cases); *see also, e.g.*, *Sec. & Commc'ns Sys., Inc. v. Hooper*, 575 S.W.2d 606, 607 (Tex. Civ. App.—Dallas 1978, no writ); *Metal Structures*, 347 S.W.2d at 273.

[11] The dissent asserts that the procuring-cause doctrine is inconsistent with a Texas Workforce Commission (TWC) rule on commissions and bonuses. *Post* at 7–8.  Neither party to this case has mentioned the TWC.  The cited rule seems consistent with the doctrine: "Unless otherwise agreed, the employer shall pay, after separation, commissions or bonuses earned as of the time of separation."  40 Tex. Admin. Code § 821.26(b).  The rule contemplates paying commissions "*after* separation."  *Id.* (emphasis added).  It confirms that commissions "are earned when the employee has met all the required conditions set forth in the applicable agreement with the employer."  *Id.* § 821.26(a)(1).  Nothing that we see poses any conflict with our resolution of the common-law question presented here.  We reserve to a future day any potential conflict with TWC decisions.  That day seems unlikely ever to come, because the statutory scheme administered by the TWC is "an alternative remedy that is cumulative of the common law" and "do[es] not abrogate common law claims against employers for an alleged failure to pay compensation."  *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 88 (Tex. 2008), *superseded by statute on other grounds,* Act of Apr. 28, 2009, 81st Leg., R.S., ch. 21, §§ 1–2, 2009 Tex. Gen. Laws 40, 40 (codified at Tex. Lab. Code § 61.052(b-1)).

*Gen. Ins. Corp.*, 640 S.W.3d 195, 203 n.12 (Tex. 2022) (Huddle, J.). If they do, they can displace the procuring-cause doctrine, and we will honor their choice.

Departing from the procuring-cause doctrine's default rule requires no magic language. A contract merely needs to provide terms that are inconsistent with the default rule—which is to say, terms that in some way cabin the textually imposed contractual obligation to pay a commission. The contract could deny the payment of commissions from procured sales absent continued employment; authorize commissions only on sales that close during the employment or brokerage relationship; condition commissions on the money from the sale being received within a particular time frame; provide a time limit after termination beyond which commissions from procured sales will not be paid; or include a myriad of other terms that could displace the procuring-cause doctrine in whole or in part.

When a contract prescribes otherwise-valid binding terms for how to handle post-termination commissions, therefore, the courts will enforce them. Contractual silence, however, leaves the procuring-cause doctrine intact as to those contracts to which the doctrine applies.

The parties before us were entitled to freely depart from the procuring-cause doctrine's default rule. The core of BMGL's argument is that the parties *did* displace the doctrine—by signing the employment agreement.[12]    BMGL's argument, therefore, depends on finding

---

[12] Indeed, BMGL's objection to the jury charge was not to its substance—that is, it did not contend that the trial court misstated the law of the procuring-cause doctrine. BMGL only contended that the procuring-cause

*something* in the employment agreement's text that addresses whether the parties intended to depart from the default rule. The agreement's at-will provision and its "your net sales" provision are the only textual possibilities, but they cannot displace the procuring-cause doctrine. Nor is there any ambiguity that creates a fact question.

**1**

First, we cannot agree that the agreement's "at-will" provision displaces the procuring-cause doctrine.[13] This argument is not really based on the text between these two parties; rather, it reflects the far broader position that at-will employment is inherently inconsistent with the default rule. We disagree with that assertion.

Distinctions in employment status—for example, whether Perthuis was an at-will employee or an independent contractor or something else—have nothing to do with the question that implicates the procuring-cause doctrine. That question is whether *commissions* that would flow from sales procured while the employee was employed (or otherwise engaged) may be forfeited solely because, before the commission is paid, the employment ends.

Perthuis's termination certainly generated *other* important consequences for both parties. He was no longer entitled to his salary

---

instruction should not have been included at all, so BMGL's sufficiency challenge, discussed below, should be evaluated against the jury charge that was given. We thus need express no opinion about the particular language of that charge or the extent to which it would comply with today's opinion.

[13] The employment agreement states: "Your employment will be 'at-will,' which means that you or BMGL may terminate your employment at any time for any reason, with or without cause, and with or without notice."

14

(because he was an at-will employee) or any retention bonus (because he signed an agreement that expressly disclaimed such a bonus if he was no longer employed). By making Perthuis an employee and paying him a salary—rather than leaving him as an independent contractor— BMGL gained Perthuis's exclusivity. Perthuis, in turn, had received the certainty of at least some income no matter what happened vis-à-vis his sales. The retention bonus played a similar role; it made it more attractive for Perthuis to stay with BMGL. Perthuis's termination ended these mutual benefits and obligations.

Sales commissions, however, function differently. They rewarded the fruits of Perthuis's past labor. While Perthuis was employed by BMGL, he received continuing quarterly commissions as sales flowed in under the contracts he had previously negotiated with Natera and other channel partners. To receive those commissions quarter after quarter, nothing more was necessary *from him*. He did not need to be involved in the details of individual sales or the invoicing and processing of batches of genetic tests. No such roles are inherently necessary for entitlement to sales commissions: "The fact that the owner himself has negotiated the sale does not prevent the broker from being regarded in law as the procuring cause of the transaction." *Hutchings v. Slemons*, 174 S.W.2d 487, 489 (Tex. [Comm'n Op.] 1943).[14]

---

[14] BMGL argues that completed "sales" that can generate commissions exist only once tests are "ordered, performed, and billed." But Perthuis does not argue, and we do not hold, that he would be entitled to commissions without sales that were completed that way. Rather, the question is whether Perthuis's work, during the time that he was employed, made him *the procuring cause* of such completed sales. In any event, the jury could reasonably regard the Natera

15

If the jury could conclude that Perthuis had "fully performed" his "part of the contract" by the time BMGL fired him, *Goodwin*, 185 S.W. at 297, then the termination made no difference. Perthuis presented his role as getting the larger deal done, just as with the original Natera contract. If this in fact reflected his duty to BMGL, then BMGL had extracted from Perthuis essentially everything that it would have gotten from him vis-à-vis the new Natera deal *whether he was fired or not*.[15] BMGL signed that deal the day after it fired Perthuis, without further work.

Accordingly, Perthuis's termination does not inherently affect his entitlement to commissions. Absent the parties' direction to deviate from the default rule, it is analytically unsound to derive any meaning from the at-will-employment context regarding the obligation to pay commissions for sales procured *before termination*. Just as salary may be owed for days of work completed before termination, so too may commission fees be owed for sales to buyers procured from work completed before termination. So long as Perthuis *was* the procuring cause of any particular sale (a question we address in Part II.C), then he was entitled to a commission absent some contractual language to the

---

agreement as having greater teeth than BMGL suggests, given Natera's affirmative promise (subject to financial consequences for breach) to buy a minimum number of genetic tests: "Natera shall purchase 36,000 Analytical Services using GeneAware . . . ."

[15] We discuss the arguments in this conditional way because we leave it in the first instance to the court of appeals to review whether the evidence was both legally and factually sufficient. We recognize that the standard of review requires that all inferences favor the jury's verdict. Our point here is to illustrate how the legal analysis applies.

contrary.[16]

**2**

The only other contractual provision that might displace the procuring-cause doctrine is the employment agreement's lone sentence that addresses commission fees: "Your commission will be 3.5% of your net sales." Neither in isolation nor read within the context of the short employment agreement of which it is a part, however, does anything in that spare sentence address whether terminating Perthuis's employment would affect his entitlement to commissions for sales that he procured while still employed.

To the contrary, far from *displacing* the procuring-cause doctrine, the employment agreement's statement that Perthuis would receive a "commission" for his "net sales" is the very text that *implicates* the doctrine. "[Y]our net sales" provides the trigger for paying commissions. The doctrine would not apply without a promise of a commission tethered to sales. The contract defines neither "commission" nor "net sales," and those terms' ordinary meanings do not suggest that firing Perthuis would end any entitlement he had to commissions for sales that his prior work procured.

---

[16] The dissent agrees that the procuring-cause doctrine "makes sense" for broker relationships in the real-estate context but doubts its applicability for at-will employees. *Post* at 6–7. But neither the dissent nor any party has shown any material distinction; no one has shown why offering a (potentially quite small) wage along with (potentially significant) commissions would change the nature *of the commissions*. Neither the dissent nor BMGL cites— and we have not discovered—a case where a court, in Texas or elsewhere, held that at-will status alone forestalls the payment of commissions for sales completed *after* termination but procured from work done *before* termination.

**3**

Finally, BMGL argues in the alternative that the contract is at least ambiguous about the parties' intent relative to what would happen upon Perthuis's termination. The dissent likewise finds ambiguity by contending that both parties offered "reasonable" interpretations of the commission provision. *Post* at 11–12. We agree that *if* there were insoluble ambiguity about the commission obligation, it would present a fact question for a jury. We cannot agree, however, that any fact question arises here. The contract is *silent* about any *exceptions* to the obligation to pay commissions; it is not ambiguous.

The procuring-cause doctrine does not preclude severing the obligation to pay sales commissions from procuring the sales. The doctrine's very function, however, is to deem silence about such an exception to reflect the parties' intent to foreclose such an exception. Said another way, it is unreasonable as a matter of law to allow for such an exception when the contract is silent. This analysis reflects how we deploy all other tools of contractual construction, whose function is to reduce the range of interpretations that qualify as "reasonable." Parties *can* define ordinary words to have bizarre meanings, for example; but if they are silent, we will dismiss as unreasonable any post-litigation effort to give words a peculiar meaning.[17]

---

[17] Our disagreement with the dissent largely boils down to this point. The dissent faults the procuring-cause doctrine for not asking a jury to determine "what *these* parties intended *their* contract to mean." *Post* at 13–14 (original emphasis). That objection could apply to any number of tools that courts use to eliminate ambiguity, however. And if we were to endorse that objection and prioritize subjective intent to such a degree, we would surely see a

Accordingly, there is only one reasonable interpretation here: that BMGL and Perthuis did not agree to cancel, upon termination of Perthuis's employment, commissions he otherwise would be owed. No fact issue on contract interpretation exists. Our conclusion is consistent with our goal of giving effect to the parties' "intent as expressed in the written document." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744 (Tex. 2020). In no way does it "remake their contract by reading additional provisions into it." *Gilbert Tex. Constr.*, 327 S.W.3d at 126. Quite the contrary; the procuring-cause doctrine functions to ensure that *no one* can inject "additional provisions"—including the sort that BMGL suggests.[18] Had BMGL intended continuing employment to be a

---

surge in cases where clear contractual text is deemed ambiguous. We reaffirm, however, that courts give effect to intent as expressed in writing because "it is objective, not subjective, intent that controls." *Matagorda County Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (quotation omitted).

[18] The dissent cites two cases for the proposition that ambiguous commission provisions warrant consideration of extrinsic evidence. *Post* at 7 n.6. We take no position on the correctness of those cases but note that they support rather than undermine our point. In *Tex–Fin, Inc. v. Ducharne*, the contract indicated that the employee would earn a sales bonus if certain conditions were met. 492 S.W.3d 430, 441–42 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Continued employment was not one of those conditions, and the court therefore concluded that the "plain language of the agreement [did] not condition earning a sales bonus on any annual employment requirement." *Id.* (holding that the TWC erred in relying on extrinsic evidence that the employer did not intend to pay a bonus based on a partial year of employment but that the TWC appropriately considered extrinsic evidence that bonuses were paid in December). Likewise, in *Vassar Group, Inc. v. Heeseon Ko*, the contract provided that, "[u]pon termination of this Contract," the contractor would be paid "any commission 'earned' in accordance with the [employer's] customary procedures . . . ." No. 05-18-00814-CV, 2019 WL 3759467, at *1 (Tex. App.— Dallas Aug. 9, 2019, no pet.). The contract expressly invoked those "customary procedures," the parties advanced differing theories on what "'earned' in

19

condition for Perthuis to receive commissions on sales that he had already procured, then "it would have been simple to have said so." *Id.* at 127. If BMGL had done so and Perthuis had accepted it, we would enforce it. Notably, BMGL *did* use such language elsewhere—in the retention agreement, which Perthuis signed the same day as the employment agreement, and in the new policy governing more junior employees' commissions, which BMGL announced the very month that it fired Perthuis.

We find no ambiguity. Regardless, latent ambiguity would not change the result. BMGL's counsel drafted the employment agreement, which Perthuis accepted as presented. Even assuming for argument's sake that the words "your net sales" were ambiguous, a court would resolve ambiguity about whether the parties intended to displace the procuring-cause doctrine against BMGL, the drafter of the employment agreement. *See, e.g.*, *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) (requiring the construction of contractual ambiguity "against the party who drafted it since the drafter is responsible for the language used"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 42, 151 (2012) (endorsing "the venerable principle that an ambiguity should be resolved against the party responsible for drafting the document" and "the rule that ambiguities in contracts will be interpreted against the party that prepared the contract").[19]

---

accordance with the [employer's] customary procedures" meant, and the court considered extrinsic evidence about the employer's usual practices. *Id.* at *5.

[19] We need not quarrel with the dissent's contention that use of this tool is a last resort—after all, that is still *before* asking a jury what the parties

Accordingly, the court of appeals' error was to misapprehend the consequence of its correct observation that "[n]othing in the language of the [employment agreement] indicated that the parties intended to pay commissions under a procuring-cause standard or that Perthuis was entitled to commissions based solely on the [contracts with the channel partners]."[20] The court was right that the contractual text does not itself *adopt* the procuring-cause standard in the employment agreement. But no such "opt-in" is required. Likewise, a contract has no obligation to expressly define a word to use its ordinary meaning. In both instances, the default rule requires *opting out*, not the other way around. The legal consequence of silence is that the default rule remains intact.

\* \* \*

We hold that nothing in the agreement between the parties before us displaced the procuring-cause doctrine.

### C

We arrive at the third question. Even when the procuring-cause doctrine applies to a contractual relationship, as it does here, the plaintiff still must show that he was in fact the procuring cause of specific sales.

---

intended. *See post* at 5 n.2. In any event, we do not rely on the fact that BMGL's counsel drafted and signed the employment agreement—we simply note that this undisputed fact would further undermine any effort to submit a fact question to a jury.

[20] Likewise, the court observed, "Nothing in the parties' agreement . . . indicates that BMGL agreed to compensate him for sales from customers that he had 'procured' even after Perthuis was no longer employed by BMGL. Nothing in the contract indicates that Perthuis was entitled to a commission for procuring channel partners or for negotiating Laboratory Services Agreements like the one with Natera."

**1**

A plaintiff who properly invokes the procuring-cause doctrine to recover sales commissions must prove that the specific sale was the direct and proximate result of the plaintiff's efforts or services. *See Keener*, 250 S.W. at 152 (referring to the "general rule" that a broker earns a commission when the broker's "efforts were the primary, proximate, and procuring cause of the deal negotiated" and where "the transaction is directly attributable to the broker" (quotation omitted)).[21] A plaintiff meets that burden by proving the plaintiff set in motion "a chain of events . . . which, without a break in their continuity, cause the buyer and seller to reach agreement on the sale" as a primary and direct result of the plaintiff's efforts. 49 Am. Jur. *Proof of Facts* 3d 399 § 13 (1998).[22] This necessarily requires the plaintiff to be both the "proximate" and "but for" cause of those sales. *Embrey v. W.L. Ligon & Co.*, 12 S.W.2d 106, 108 (Tex. [Comm'n Op.] 1929).[23]

A plaintiff could satisfy this standard by proving that he was the

---

[21] Indeed, "[a]s used in that branch of the law relating to brokers' commissions, the terms 'procuring cause,' 'efficient cause,' and 'proximate cause' have substantially, if not quite, the same meaning and are often used interchangeably." 12 C.J.S. *Brokers* § 258 (2015).

[22] *See* also 12 C.J.S. *Brokers* § 257 ("A sale or other transaction must be the direct and proximate result, or the immediate causal connection, of the broker's efforts or services, as distinguished from one that is indirect and remote, between the introduction of the broker and the consummation of the transaction." (footnotes omitted)).

[23] By contrast, the ordinary contractual causation standard requires a plaintiff to show that "the damage sued for has resulted from the conduct of the defendant." *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex. 1985).

procuring cause of a single contract that, without further negotiations or modifications, produced a stream of sales. Or he could show that any changes to the contract were immaterial and his role was still the primary and direct cause of the sales. But it would not be enough for a plaintiff to simply identify and claim credit for a general relationship, like BMGL's relationship with Natera.

These requirements ensure both that a plaintiff recovers commissions that are due and that a defendant is not obligated to pay commissions that are attenuated from the plaintiff's role. A "rule of fairness and right," *Goodwin*, 185 S.W. at 296, after all, requires fairness for the defendant as well as the plaintiff. The defendant must be free to show that the causal link was severed. As this Court has explained, for example, a salesman who "made an unsuccessful effort to induce the buyer to purchase the property and had ceased his efforts to accomplish that result, all without fault on the part of the owner," is not the procuring cause when the sale was later made "as the result of independent negotiations directly between the owner and the buyer, or through the medium of some other broker." *Air Conditioning, Inc. v. Harrison-Wilson-Pearson*, 253 S.W.2d 422, 425 (Tex. 1952) (quotation omitted); *see also, e.g.*, *Shepard v. Wesson*, 266 S.W.2d 393, 395 (Tex. Civ. App.—Amarillo 1953, no writ) (upholding the jury's finding that the broker was the procuring cause of the sale when there was no intervening act between the broker's actions and the sale).

Another manifestation of this principle is almost the reverse scenario—where the jury could find that the passage of time eventually severs the causal link between a plaintiff's initially *successful* role as

23

broker or agent and some later sale. Even if the defendant must pay commissions for earlier sales, therefore, that defendant can defeat commissions beyond a given point by showing that, from then on, the plaintiff was at best only a remote and attenuated cause of the later sales, not a primary and direct cause. A binding, multi-year contract that a plaintiff brokered and that generates repeated sales with no material adjustments may require commissions throughout the full term, because all those sales could be attributed to the same labor on the plaintiff's part. But significant maintenance may be required for other contractual relationships to endure. If the efforts of others were indispensable to salvaging or preserving a foundering contractual relationship, or if the contract itself must be reworked, a jury could conclude that the entitlement to commissions no longer existed.

Likewise, a defendant could sever the causal link by establishing that no commissions would be due to the plaintiff *even if she had remained employed*. A plaintiff who *lacks* continuing employment could not recover commissions under the procuring-cause doctrine if the same person would not be entitled to them if still employed.

These consequences follow from the basic principle that the courts will not award speculative damages, including for any claim that is "too remote and depend[ent] upon too many contingencies . . . ." *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 187 (Tex. 2022) (quotation omitted). Damages must always be "proved with reasonable certainty," *id.* at 186 (quotation omitted), a principle that "acknowledges the limited competence of courts to track the complex effects of a breach of contract in an interdependent marketplace." *Id.* at 187.

24

Claims of procuring-cause status will usually present a fact question.[24] When they do, trial courts should give juries clear instructions regarding the plaintiff's burden to show his status as the procuring cause for each sale at issue and the defendant's ability to defeat that showing, in whole or in part, with evidence that the plaintiff's original role had been overtaken by events and changed circumstances.[25]

**2**

The jury in this case found that Perthuis was in fact the procuring cause of at least some of BMGL's sales. The standard of review requires courts to view the record in the light most favorable to the jury's verdict. *See, e.g.*, *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009).

But Perthuis must show his entitlement to commissions on sales even as the BMGL–Natera relationship evolved in various phases. At a certain point, even Perthuis acknowledges the theoretical possibility that his contribution could have become too attenuated to qualify as a "procuring cause" for any further sales. Both in his briefing and at oral argument, Perthuis agreed that if an entirely new contract with Natera had to be negotiated (at least for reasons other than a bad-faith attempt

---

[24] That is, while the question of the doctrine's *applicability* is typically a legal question, whether the plaintiff actually had the *status* of a procuring cause generally requires factual assessment of the plaintiff's contribution to the sale at issue.

[25] We accordingly find greatly overstated BMGL's repeatedly expressed concern that a plaintiff who establishes her direct and primary role in causing *some* sales might, by that mere fact, establish a "lifetime" commission on all future sales involving that buyer. Perthuis himself advocated no such rule, and our decision precludes recovery of such claimed commissions absent sufficient evidence regarding every sale for which the plaintiff claims to be the procuring cause.

to escape the commission obligation), then Perthuis could claim no further commissions despite his central and significant role in maintaining the BMGL–Natera relationship early on. That is, Perthuis concedes that it would not be enough to say something like, "Without my efforts, Natera's business would have been lost forever, so I am still the procuring cause under a totally new contract."

Perthuis contended that the nature of the contractual relationship did *not* materially change, and that he remained the procuring cause of sales to Natera all the way up to trial. BMGL, of course, strenuously argued the opposite. The jury refused to award the full amounts that Perthuis requested, which suggests that at least some of BMGL's arguments regarding Perthuis's decreasing causal link to later sales persuaded the jury.

The court of appeals has not yet undertaken its sufficiency analysis under the proper legal framework because it reversed the judgment for Perthuis for an independent reason: its conclusion that the procuring-cause doctrine did not apply to the parties' contract. The court of appeals' disposition made it unnecessary for that court to reach the remainder of BMGL's arguments that are predicated on the evidence presented at trial. Our decision today requires consideration of those arguments.

We therefore reverse the judgment of the court of appeals and remand the case to that court for further proceedings, including assessing any further challenges to the trial court's judgment that BMGL has preserved. We express no opinion on whether each or any of the relevant contractual amendments, or anything else, was sufficiently substantial to sever any causal link between Perthuis and sales to Natera (or other

channel partners).  We leave to the court of appeals in the first instance to determine the proper disposition of this case, and we disclaim any intention to limit the court of appeals' resolution of the case on remand.[26]

### III

The court of appeals' judgment is reversed and the case is remanded to the court of appeals for further proceedings.

_____

Evan A. Young
Justice

**OPINION DELIVERED:** May 20, 2022

---

[26] Depending on its resolution of Perthuis's entitlement to commissions, the court of appeals should consider his cross-appeal with respect to attorneys' fees.

27